2007 WY 96

**W.N. McMURRY CONSTRUCTION CO., a Wyoming corporation, Appellant (Plaintiff),**

v.

**COMMUNITY FIRST INSURANCE, INC. WYOMING, a Wyoming corporation, BW Insurance Agency, Inc., and Ohio Casualty Insurance Company, an Ohio corporation, Appellees (Defendants).**

No. 06–271.

Supreme Court of Wyoming.

June 15, 2007.

Representing Appellant: W.W. Reeves of Park Street Law Office, Casper, Wyoming.

Representing Appellee BW Insurance Agency, Inc.: Richard A. Mincer and Billie L.M. Addleman of Hirst & Applegate, P.C., Cheyenne, Wyoming. Argument by Mr. Mincer.

Representing Appellee Ohio Casualty Insurance Company: Patrick J. Murphy and Ryan Schwartz of Williams, Porter, Day & Neville, P.C., Casper, Wyoming. Argument by Mr. Murphy.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

VOIGT, Chief Justice.

[¶ 1] A construction company appeals from summary judgments granted to an insurance agency and an insurance company in a controversy primarily involving a builder's risk insurance policy. The construction company also appeals from the district court's denial of its motion to amend its complaint. We affirm the denial of the motion to amend, but reverse the summary judgments in part and remand this matter to the district court for further proceedings consistent herewith.

### ISSUES

[¶ 2] 1. Whether the builder's risk policy claims, including reformation, were barred by the construction company's failure to read the insurance documents or by its failure to mitigate damages?

2. Whether the district court erred in denying the construction company's motion to amend its complaint?

### FACTS

[¶ 3] Early in 2005, McMurry Construction obtained a contract from the State of Wyoming to construct two steel buildings at the State Fairgrounds in Douglas. McMurry Construction's bid was $5,521,299.00–$3,368,761.00 for a livestock pavilion and $2,298,759.00 for a multi-purpose show center.[1] The contract required McMurry Construction to obtain builder's risk insurance covering 100% of the contract amount.[2] Anticipating this requirement, McMurry Construction had turned to BW Insurance, the

---

1. The State sought separate bids—one for each building, and one composite bid. McMurry's composite bid was accepted as the low bid.

2. Generally speaking, builder's risk insurance covers the owner's interest in the property during construction. 11 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* §§ 155:42–43, at 155–60 & 155–61 (3d ed. 1998 & Cum.Supp. 2006).

agency it typically used, to procure premium estimates for the builder's risk and other insurance and bonding requirements of the project. BW Insurance's employees estimated a premium of $8,415.00 for the builder's risk insurance on the originally estimated contract price of $4,500,000.00. McMurry Construction used that premium estimate in calculating its bid.

[¶ 4] Upon learning that McMurry Construction would be awarded the contract, BW Insurance sent an insurance application to Ohio Casualty, seeking "blanket" builder's risk coverage for the two buildings because both buildings were to be insured under the same contract number. The contract amount was stated in the application to be $5,524,000.00. Because Ohio Casualty does not issue "blanket" builder's risk policies—meaning one limit covering multiple buildings—Ohio Casualty asked BW Insurance to break out the values of the two buildings. In turn, BW Insurance contacted McMurry Construction to obtain those figures. Misunderstanding what information was being sought, a McMurry Construction employee mistakenly gave BW Insurance the invoice amounts for the steel packages—$603,003.00 for the livestock pavilion, and $365,147.00 for the multi-purpose show center. Those figures were then relayed from BW Insurance to Ohio Casualty, where they were inserted as the operative coverage amounts in the builder's risk policy. The premium charged to McMurry Construction was, as a result, reduced from the estimate of $8,415.00 to $3,659.00.[3]

[¶ 5] BW Insurance mailed a certificate of insurance to McMurry Construction on March 2, 2005, showing the amount of builder's risk coverage to be $968,150.00. The policy was mailed to McMurry Construction a few days later, once again containing the builder's risk coverages of $603,003.00 and $365,147.00 for the two buildings. On March

15, 2005, BW Insurance faxed another copy of the certificate of insurance to McMurry Construction at the latter's request, and on March 18, 2005, again at McMurry Construction's request, BW Insurance faxed to it a copy of the policy's declarations page. The declarations page, as the certificate of insurance, showed the builder's risk coverage to be $968,150.00. McMurry Construction does not contest the fact that nobody in its offices read the certificate, the declarations page, or the policy upon their receipt.

[¶ 6] This case was engendered when the livestock pavilion collapsed as it neared completion on June 11, 2005, due to improper bracing by a subcontractor. The cost to return the building to its condition before it collapsed was $951,715.00. McMurry Construction purchased a new steel building package and reconstructed the livestock pavilion using its own employees. It also reached a proposed settlement agreement with its subcontractor's insurer for $223,315.19.

[¶ 7] Ohio Casualty sent a builder's risk claim analyst to the building site four days after the collapse. The claim analyst estimated the damage amount, applied the policy's under-insured co-insurance penalty to that figure, and then advanced $150,000.00 to McMurry Construction before any formal claim was presented.[4] Eventually, Ohio Casualty calculated the total policy benefit to be $176,543.19, and, after deducting the $1,000.00 deductible, sent an additional $25,543.19 to McMurry Construction.

[¶ 8] On November 14, 2005, McMurry Construction filed suit against BW Insurance and Ohio Casualty, alleging breach of contract, negligence, and imputed liability, and seeking reformation of the insurance policy.[5] In its proposed amended complaint, McMurry Construction sought to add new claims that coverage was due it under its commercial general liability (CGL) policy, that Ohio

---

3. The original premium estimate was, to say the least, inaccurate. Had Ohio Casualty provided builder's risk coverage of $5,521,229.00, the premium would have been $20,790.00.

4. Insurers impose a "co-insurance penalty" in builder's risk policies where the coverage is not equal to the property's full value.

5. BW Insurance is the successor to an original named defendant, Community First Insurance, Inc., Wyoming.

Casualty had wrongfully interfered with its subcontractor settlement by asserting its subrogation claim, that BW Insurance breached fiduciary duties created by its special relationship with McMurry Construction, that Ohio Casualty breached the implied covenant of good faith and fair dealing, and that McMurry Construction was entitled to recover attorney's fees and interest under Wyo. Stat. Ann. § 26–15–124 (LexisNexis 2005) because Ohio Casualty's denial of coverage under the builder's risk policy was unreasonable. Finally, McMurry Construction sought to add a claim against BW Insurance, unrelated to the foregoing, based upon the alleged failure to include a particular employee as a covered driver under the company's business auto policy.

## THE DISTRICT COURT DECISION

[¶ 9]  Both BW Insurance and Ohio Casualty filed motions for summary judgment. Those motions, and McMurry Construction's motion for leave to amend its complaint, were heard by the district court on August 28, 2006. The gist of BW Insurance's and Ohio Casualty's summary judgment argument, as well as their present argument, was summarized as follows in their joint pre-hearing memorandum:

> For purposes of this summary judgment motion, the Court may assume that BW Insurance and Ohio Casualty were each negligent (for not providing the requested $5,521,299 limits in the first instance, and for not catching any error with the $968,150 limits before the building collapsed). The Court may also assume that BW Insurance breached its contract with McMurry Construction by not providing a builder's risk policy with limits of $5,521,299. The Court may even assume, for purposes of this motion, that BW Insurance is deemed to be Ohio Casualty's agent, and that Ohio Casualty would be vicariously liable for any acts, errors, omissions, or breaches of BW Insurance.
>
> [McMurry Construction's] claims for reformation, negligence, negligent misrepre-

sentation, breach of contract and imputed liability are each barred by both the insured's failure to read its policy and the duty to mitigate, or avoid, its damages.

[¶ 10]  The district court accepted this argument and, relying upon several Wyoming cases that we will discuss below, granted the summary judgment motions. *See infra* ¶¶ 14, 21–28. In addition, the district court concluded that the causes of action alleged in the proposed amended complaint related to the builder's risk policy would not survive summary judgment because they were also barred by McMurry Construction's failure to read the insurance documents. The court, therefore, exercised its discretion and denied the motion to amend the complaint as to those causes of action.

[¶ 11]  Amendment of the complaint to add the two remaining claims—violation of the separate CGL policy, and failure to provide appropriate business auto coverage—was also denied, but for different reasons. As to the CGL policy, the court found that its coverage was never triggered because McMurry Construction produced no evidence that it had become legally obligated to pay any sums for which Ohio Casualty would be liable.[6] The district court denied amendment of the complaint to add the business auto policy claim because that claim involved an unrelated factual matter and a separate policy, for which discovery was not complete.

## DISCUSSION

### *Summary Judgment*

[¶ 12]  Our standard for the review of a summary judgment was set forth in *Abraham v. Great Western Energy, LLC,* 2004 WY 145, ¶ 12, 101 P.3d 446, 452–53 (Wyo.2004):

> When we review a summary judgment, we have before us the same materials as did the district court, and we follow the same standards which applied to the proceedings below. The propriety of granting a motion for summary judgment depends upon the correctness of the dual findings

---

6.  McMurry Construction rebuilt the livestock pavilion without any claim or legal demand being   made by the State of Wyoming.

that there is no genuine issue as to any material fact and that the prevailing party is entitled to judgment as a matter of law. A genuine issue of material fact exists when a disputed fact, if proven, would have the effect of establishing or refuting an essential element of an asserted cause of action or defense. We, of course, examine the record from a vantage point most favorable to that party who opposed the motion, affording to that party the benefit of all favorable inferences that fairly may be drawn from the record. If the evidence leads to conflicting interpretations or if reasonable minds might differ, summary judgment is improper. That standard of review is refined somewhat when applied to a negligence action. Summary judgment is not favored in a negligence action and is, therefore, subject to more exacting scrutiny. *Woodard v. Cook Ford Sales, Inc.,* 927 P.2d 1168, 1169 (Wyo.1996). We have, however, affirmed summary judgment in negligence cases where the record failed to establish the existence of a genuine issue of material fact. *See Krier v. Safeway Stores 46, Inc.,* 943 P.2d 405 (Wyo.1997) (failure to establish duty); *Popejoy v. Steinle,* 820 P.2d 545 (Wyo.1991) (failure of proof of underlying claim of a joint venture); *MacKrell v. Bell H₂S Safety,* 795 P.2d 776 (Wyo.1990) (failure of proof of defendant's duty); *DeWald v. State,* 719 P.2d 643 (Wyo.1986) (cause element was pure speculation); and *Fiedler v. Steger,* 713 P.2d 773 (Wyo.1986) (failure to establish cause in a medical malpractice action). *See McMackin v. Johnson County Healthcare Center,* 2003 WY 91, ¶¶ 8–9, 73 P.3d 1094, ¶¶ 8–9 (Wyo.2003).

[¶ 13] Our task is made easier in the present case because, for purposes of their summary judgment motions, BW Insurance and Ohio Casualty admitted both negligence and breach of contract. The issue left for us is purely a legal one, which we review *de novo,* giving no deference to the district court's determination. *Eklund v. Farmers Ins. Exch.,* 2004 WY 24, ¶ 10, 86 P.3d 259, 262 (Wyo.2004). That issue is whether McMurry Construction's claims are barred by its failure to read the builder's risk policy documents, or by its failure to mitigate damages. Our analysis will focus upon the even more specific question of whether the equitable doctrine of reformation survives in the face of a clear violation of the failure-to-read rule and the failure to mitigate damages.

[¶ 14] In numerous cases over the years, this Court has espoused the principle that an insured has a duty to read his or her insurance policy. The primary cases in that jurisprudence are the following: *St. Paul Fire & Marine Ins. Co. v. Albany County Sch. Dist. No. 1,* 763 P.2d 1255, 1263 (Wyo.1988) (doctrine of reasonable expectations not applicable where policy is unambiguous, and does not absolve insured from duty to read policy); *Darlow v. Farmers Ins. Exch.,* 822 P.2d 820, 828–29 (Wyo.1991) (adjuster did not take advantage of insureds' ignorance, especially where insureds had fulfilled their duty to read the policy); *Feather v. State Farm Fire & Cas.,* 872 P.2d 1177, 1181–82 (Wyo.1994) (insured's lack of reasonable diligence in failing to read renewal notices defeated claim against insurer for not providing coverage for a particular vehicle); *Small v. King,* 915 P.2d 1192, 1194 (Wyo.1996) (insured who fulfilled duty to read policy and became aware that it was unacceptable, had further duty to reject the policy or to renegotiate with the insurer); *Ahrenholtz v. Time Ins. Co.,* 968 P.2d 946, 950 (Wyo.1998) (court may not reform unambiguous policy simply because insured failed to read it); *Cordero Mining Co. v. United States Fid. & Guar. Ins. Co.,* 2003 WY 48, ¶¶ 26–32, 67 P.3d 616, 625–27 (Wyo.2003) (insured's failure in its duty to read policy and reject it as unacceptable, and third party beneficiary's similar failure to avoid loss by allowing project to proceed without determining existence of required coverage, relieved insurer from resulting injury); *Cathcart v. State Farm Mut. Auto. Ins. Co.,* 2005 WY 154, ¶ 49, 123 P.3d 579, 596 (Wyo.2005) (question not answered whether defense of failure to read policy available in case of non-policyholder insured's such failure).

[¶ 15] The federal courts have also interpreted Wyoming law as imposing upon an insured the duty to read his or her policy. In *National Farmers Union Property & Casualty Co. v. Zuber,* 824 F.Supp. 1017, 1021

(D.Wyo.1993), the District Court for the District of Wyoming granted summary judgment to an insurer in a dispute over coverage limits because the policy was unambiguous and the insureds did not read the policy or object when they received renewal notices of, and paid premiums for, lesser coverage than they believed the policy provided. Similarly, in *Brown v. Royal Maccabees Life Ins. Co.*, 137 F.3d 1236, 1244 (10th Cir.1998), the Tenth Circuit Court of Appeals affirmed summary judgment in favor of an insurer on the ground that promotional materials were not part of the insurance policy, and because insureds have a specific duty under Wyoming law to read their policy.

[¶ 16]  BW Insurance and Ohio Casualty also rely upon the similar but separate "refinement" of the general rule of mitigation of damages stated in *Moore v. Continental Insurance Co.*, 813 P.2d 1296, 1301 (Wyo.1991):

> There is a refinement of the mitigation rule which we hold to be applicable here, i.e., Restatement, Second, Contracts § 350 (1981):
>
> > "(1) Except as stated in Subsection (2), damages are not recoverable for loss that the injured party could have avoided without undue risk, burden or humiliation.
> >
> > "(2) The injured party is not precluded from recovery by the rule stated in Subsection (1) to the extent that he has made reasonable but unsuccessful efforts to avoid loss."
>
> The rationale of this principle, which differentiates it from mitigation in a more general sense, is that damages which the plaintiff might have avoided with reasonable effort and without undue risk, expense, or humiliation are either not caused by the defendant's wrong or need not have been, and, therefore, are not to be charged against him.  11 Williston on Contracts, § 1353 (3rd ed.1968); 5 Corbin on Contracts § 1039 (1964).

[¶ 17]  The gist of the failure-to-read principle differs from the gist of the *Moore* principle; the former faults the insured for failing to gain necessary information by not reading the policy, while the latter faults the insured for failing to act upon information

obtained by reading the policy or otherwise. The similarity between the two principles is that, by a simple act, the insured could have protected himself or herself from harm.

[¶ 18]  Undoubtedly, BW Insurance and Ohio Casualty admitted negligence and breach of contract for purposes of their summary judgment motions under the assumption that these defenses—failure to read the policy and failure to mitigate damages—protected them from liability.  McMurry Construction counters, however, with the proposition that, in none of the cited cases, did these defenses triumph in the face of a properly pled and proven cause of action for reformation of contract.  Before we look back at those cases, we will reiterate the law of reformation of contracts, sometimes known as the law of mutual mistake:

> Reformation is an equitable remedy which emanates from the maxim that "equity treats that as done which ought to have been done."  66 Am.Jur.2d *Reformation of Instruments* § 2 at 528 (1973).  At its most fundamental level, the remedy acknowledges the fact that for one reason or another written instruments do not always accurately memorialize the antecedent agreement of the parties.  *See* 3 Arthur L. Corbin, *Corbin on Contracts* § 540 (1960).  Accordingly, a court acting in equity may reform a written instrument upon clear and convincing evidence of the following elements: (1) a meeting of the minds— a mutual understanding between the parties—prior to the time a writing is entered into, (2) a written contract, or agreement, or deed (3) which does not conform to the understanding, by reason of mutual mistake.  Clear and convincing evidence is defined as "that kind of proof which would persuade a trier of fact that the truth of the contention is highly probable."  *MacGuire v. Harriscope Broadcasting Co.*, 612 P.2d 830, 839 (Wyo.1980).

*Hutchins v. Payless Auto Sales, Inc.*, 2002 WY 8, ¶ 19, 38 P.3d 1057, 1063 (Wyo.2002) (citations omitted).

[¶ 19]  The availability of the remedy of reformation is entirely dependent upon two particulars: (1) that the mistake

occurred in the drafting of the instrument, rather than in reaching the antecedent agreement, *Hutchings v. Krachun*, 2002 WY 98, ¶ 20, 49 P.3d 176, 183 (Wyo.2002), *overruled in part on other grounds by White v. Allen*, 2003 WY 39, 65 P.3d 395 (Wyo.2003); and (2) that the mistake was "reciprocal and common to both parties with each party being under the same misconception as to the terms of the written instrument," *Mathis v. Wendling*, 962 P.2d 160, 164 (Wyo.1998). In other words, an agreement was reached, but that agreement was not correctly recited in the subsequently written instrument.[7] Whether or not that initial agreement was reached is a question of fact. *Raymond v. Steen*, 882 P.2d 852, 856 (Wyo.1994).

[¶ 20] The present question is not whether this builder's risk policy should be reformed. Rather, the present question is whether McMurry Construction can seek reformation, given its failure to read the policy. As noted above, the district court concluded that McMurry Construction could not seek reformation because this Court's case law forbade it. *See supra* ¶ 10. We are, however, inclined to agree with McMurry Construction that such is not the case. A more detailed analysis of the cases cited above will show why that is true. *See infra* ¶¶ 21–28.

[¶ 21] We begin with *St. Paul Fire & Marine Insurance Co. v. Albany County School Dist. No. 1*, 763 P.2d 1255 (Wyo.1988), which involved a conflict between an insured and an insurer over a liability policy's coverage of the insured in a civil rights lawsuit against one of the insured's employees. We held that the doctrine of reasonable expectations, being a rule of insurance contract construction, is of no assistance where the policy at issue is unambiguous, and that we would not "absolve the parties to an insurance policy from the duty to read the policy." *Id.* at 1263. The insured did not seek reformation of the policy and there was no argument pre-

sented to this Court that the policy, due to mutual mistake, did not reflect the antecedent agreement of the parties. The lesson of *St. Paul Fire & Marine* is simply that an insured who possesses an unambiguous policy saying one thing cannot be heard to say that he unilaterally thought it said something else, especially where he did not even read the policy.

[¶ 22] Taking the cases in chronological order, we next consider *Darlow v. Farmers Insurance Exchange*, 822 P.2d 820 (Wyo. 1991). In *Darlow*, the insured was injured in an automobile accident. Her insurer also insured the other vehicle. The gravamen of the insured's eventual civil action against the insurer was that, in settling the insured's claim, the insurer had misled the insured in regard to maximizing coverage via a first-party claim under her own policy, as opposed to pursuing a third-party claim against the other driver. We affirmed summary judgment in favor of the insurer because the insurer had placed the insured on notice that she could secure medical payments under her own policy, and because the insured "knew and understood the terms of [her] policy, fulfilling [her] duty to read." *Id.* at 828–29. Reformation of the policy was not at issue.[8]

[¶ 23] The facts in *Feather v. State Farm Fire & Casualty*, 872 P.2d 1177 (Wyo.1994), one of the primary cases upon which BW Insurance and Ohio Casualty rely, are simple. The insured had an automobile liability policy with the insurer. The insured was in an accident and filed an indemnity claim with the insurer. The insurer denied coverage because the particular vehicle was not listed on the policy or the renewal declaration pages, and the insured had never paid a premium to cover that vehicle, or exercised due diligence in determining whether the vehicle was covered. *Id.* at 1180–82. Once again, we affirmed summary judgment in favor of the insurer due to these lapses. *Id.*

---

7. *Black's Law Dictionary* 1307 (8th ed.2004), *citing* Douglas Laycock, *Modern American Remedies* 39 (3d ed.2002), has modernized the definition of reformation to explain that "[i]f the parties made a mistake about the premises of their agreement, about some fact in the world outside their word-processing machines, reformation is not a solution."

8. This case more nearly resembles the failure-to-mitigate cases, than it does the failure-to-read cases. The logic of the case is that the insured could have avoided any losses by filing first-party medical claims, the availability of which she was aware.

at 1182. Although the insured did seek a judgment declaring that a policy was created with the disputed coverage, no request was made that the policy be reformed due to mutual mistake.

[¶ 24] *Small v. King,* 915 P.2d 1192 (Wyo. 1996), is another of the cases relied upon heavily by BW Insurance and Ohio Casualty. In *Small,* the insureds promoted a musical concert and sought from an insurance agent what they described as "full coverage" for the event. What they received was a general liability policy that did not provide coverage for certain weather-related damages. This Court upheld a jury verdict against the insureds, holding in part that the insureds, having read the policy and recognized its shortcomings, but having neither rejected nor renegotiated the policy, could not, after the damages occurred, maintain a claim for misrepresentation against the agent. *Id.* at 1194. As in *Feather,* the insureds did not seek formal reformation of the policy based on an alleged mutual mistake.

[¶ 25] The next opinion in sequence, *Ahrenholtz v. Time Insurance Co.,* 968 P.2d 946 (Wyo.1998), seems at first glance most strongly to support the contentions of BW Insurance and Ohio Casualty because in it, this Court declared that it "may not reform an unambiguous contract simply because the insured failed to read the contract and ignored warnings concerning coverage." *Id.* at 950. Despite this phraseology, however, the insured in *Ahrenholtz* did not seek the equitable remedy of contract reformation. Rather, the Court refused to "reform" the contract by applying the reasonable expectations doctrine in the face of an unambiguous contract that the insured simply had not read. *Id.* at 949–50. Summary judgment in favor of the insured had nothing to do with the unavailability of the equitable doctrine of reformation or mutual mistake.

[¶ 26] *Cordero Mining Co. v. United States Fidelity & Guarantee Insurance Co.,* 2003 WY 48, 67 P.3d 616 (Wyo.2003), is the only one of these cases in which reformation of contract was actually raised as a claim in the complaint. *Id.,* ¶ 1 at 619. The facts of *Cordero* are more complex than the facts in the other cases just described:

Cordero Mining Company (Cordero), a subsidiary of Kennecott Energy Company (Kennecott), contracted for work to be done at its mine in Campbell County. The general contractor and subcontractor were required to procure insurance naming Cordero as an additional insured. However, the subcontractor's policy failed to do so. After settling claims made against Cordero by an injured worker, the general contractor's insurer, Transcontinental Insurance Company and Continental Casualty Company (together CNA), and Cordero filed claims against the subcontractor's insurer, United States Fidelity and Guarantee Insurance Company (USF & G), and its agent, The Barlow Agency (Barlow), including claims for reformation of the insurance policy, negligence in failing to name Cordero, and breach of contract on the basis that Cordero was an intended third-party beneficiary. The district court granted summary judgment for USF & G and Barlow as to all claims.

*Id.,* ¶ 1 at 619.

[¶ 27] In affirming the summary judgment in favor of the agency and the insurer, we first concluded that (1) it was the intent of the contract between Cordero and the contractor that the contractor obtain insurance naming Cordero as an additional insured; (2) it was the intent of the contract between the contractor and the subcontractor that the subcontractor obtain insurance naming Cordero as an additional insured; (3) it was the intent of the agency to obtain insurance for the subcontractor naming "the owner of the mine" as an additional insured; and (4) this combination of facts indicates that Cordero was an intended third-party beneficiary of the subcontractor's promise to procure insurance. *Id.,* ¶ 20 at 624.

[¶ 28] After next concluding that the agency's knowledge that Cordero was to be a named insured should be imputed to the insurer, we considered the bases of the district court's ruling against Cordero, those being that the subcontractor had violated its duty to review the policy and to reject it if it did not comply with the coverage requested, and that Cordero had done nothing to ensure that the appropriate insurance was in place

before proceeding with the work. *Id.,* ¶ 25 at 625. We affirmed those conclusions based upon the reasoning of *Small, Feather,* and Moore, after first determining that Cordero, as third-party beneficiary, could be in no better position than the subcontractor, meaning that the defenses of failure to read and failure to mitigate were available to the insurer against Cordero. *Id.,* ¶¶ 27–31 at 626–27. Interestingly enough, however, in concluding that the failure-to-read and failure-to-mitigate defenses applied to bar both Cordero's breach of contract and tort claims, we did not address the district court's right, if any, to reach for the equitable remedy of reformation. *Id.,* ¶ 33 at 627. Consequently, the question of whether failure to read is a bar to reformation was not answered by *Cordero,* just as it had not been answered by any previous Wyoming case. In summary, even after *Cordero,* this Court has only gone so far as to say that the defenses of failure to read and failure to mitigate barred a plaintiff's legal contract and tort claims.[9]

[¶ 29] The courts of the country are split over the separate question of the availability of the equitable doctrine of reformation where an insured has failed to read an insurance policy.

The insured's failure to read the policy at issue has often been offered as a defense to reformation, drawing a variety of responses from the courts. While many of these decisions speak in terms of broad principles, they should be considered in light of the inherently equitable nature of reformation.

As a general rule, the courts have not been receptive to claims that insureds should be barred from reformation by their failure to examine the policy sufficiently, or to the similar claim that the insured did, in fact, read the policy and should be held to know what it said.

. . . .

Under the broad general rule, reformation is not precluded by the fact that the insured has held the policy for some time without reading it, even after a loss has occurred. Where this rule is applied, mere receipt of the policy does not charge the insured with constructive knowledge of its terms, although there is limited contrary authority, at least where the failure to read the policy is only a part of the "fault" which the insured may be said to bear for the policy not reflecting the real intent of the parties. In fact, many courts explicitly take the approach that the effect of failure to read the policy should not alone be the basis for deciding whether there is a right to reformation, but that such failure should be merely one circumstance of the case to be considered.

. . . .

The theory behind allowing reformation despite an insured's failure to read the policy is that the insured accepts the policy in the erroneous but good faith belief that it conforms to the agreement made, and to hold otherwise would permit the insurer to take advantage of its own wrong, or of a mutual mistake.

While the general rule does not bar reformation merely because the insured accepts an incorrect policy, it must still be determined whether the failure to read the policy constitutes negligence, although the trend of authority is that mere failure of the insured to read his or her policy does not amount to such laches and negligence as will bar reformation.

The principle of the above cases is also stated in terms of the rule that an insured who accepts and retains a policy is bound to know the contents thereof being inapplicable to an equitable proceeding to reform the policy.

2 Lee R. Russ & Thomas F. Segalla, *Couch on Insurance* § 27:72, at 27–74 (3d ed. 2005 & Cum.Supp.2006) (internal footnotes omitted). The contrary view is described in a later section in the same authority:

Contrary to the rule recognized in the preceding sections, there is authority that the insured has the duty to read his or her

---

9. In the different context of a renewal policy, however, we have held that the insured has the right to presume that the new policy is the same as the old, and that the insurer has the obligation to call any changes to the attention of the insured. *Aetna Ins. Co. v. Lythgoe,* 618 P.2d 1057, 1060 (Wyo.1980).

policy to ascertain the contents and if the policy is unsatisfactory the insured must object thereto at that time and not wait for loss long afterward and then claim a right of reformation. This rule has been urged even though the insured never had possession of the policy.

Under the foregoing view, an insured cannot have a policy reformed merely because it does not conform to what he or she supposed it contained, where he or she has accepted it without reading it, and there has been no deceit or overbearing inducement on the part of the insurer.

Unawareness of a provision in the policy has been held not to justify reformation unless the insured is misled by acts of the insurer, and there is limited authority that even the acts of the insurer's agent in forging the insured's signature to a document designed to obtain the insured's signed acknowledgement of denial of request for accidental death benefits, and in failing to inform insured that requested coverage for such benefits had been rejected, do not provide justification for reformation in the face of the insured's failure to inform himself or herself of the policy's terms. Equity will not reform a policy merely because it does not conform to the application, where it has been retained by the applicant without examination, at least, where the insurer had no reason to believe that it would not be read, and there is no fraud or mutual mistake.

*Id.* § 27:74, at 27–78 (2005 & Cum.Supp. 2006) (internal footnotes omitted).

[¶ 30] These contrasting views are summed up in 4A John Alan Appleman & Jean Appleman, *Insurance Law and Practice* § 2913, at 636 (1969) (internal footnotes omitted) as follows:

Two views are represented by these cases. The majority view apparently permits the insured to rely upon the thought that the oral intention of the parties was expressed in the written contract, and does not require him to examine the policy. Those cases permit recovery, as an examination of their facts will show, though the suit for reformation is not brought for several months, and perhaps even several years, after the policy was delivered. The minority view requires that the insured act diligently in examining the policy and notify the insurer if the contract is not satisfactory, and holds reformation to be barred by the insured's own laches if he fails so to do. The latter view is certainly the more logical, but it is decidedly questionable whether the average layman who is insured would ever comply with such a legal duty.

[¶ 31] These secondary sources have reviewed dozens of cases from across the country in contrasting the two views of the effect of failure to read an insurance policy upon the availability of the doctrine of contract reformation. We see no reason to duplicate that effort here. *See, e.g., Estate of Blakely v. Federal Kemper Life Assurance Co.,* 267 Ill.App.3d 100, 203 Ill.Dec. 811, 640 N.E.2d 961, 967 (2d Dist.1994) (rule that insured has duty to read the policy does not apply to equitable proceeding for reformation); *Commercial Cas. Ins. Co. v. Hosey,* 238 Ala. 335, 191 So. 343, 345 (1939) (failure to read policy not a violation of a positive duty and does not bar reformation); *Jenkad Enters., Inc. v. Transportation Ins. Co.,* 18 S.W.3d 34, 38 (Mo.Ct.App.2000) (reversing trial court's reformation of policy, because insured had failed in its duty to read the policy); *Martinez v. John Hancock Mut. Life Ins. Co.,* 145 N.J.Super. 301, 367 A.2d 904, 910 (Ct.App. Div.1976) (denying reformation of life insurance policy to raise limits where insured did not read policy). *See also* 43 Am.Jur.2d *Insurance* §§ 381–82 (2003).

[¶ 32] We are convinced that the majority view is the correct view—where effectuation of an antecedent agreement is thwarted by mutual mistake in reducing that agreement to writing, justice is not served by judicial enforcement of the mistaken writing, rather than the intended agreement, just because one of the parties did not read the writing. While we continue to hold that failure to read and failure to mitigate bar the legal claims, which is the principle espoused in *Small v. King* and the other cases from this Court cited above, *see supra* ¶¶ 14, 21–28, we conclude that they should not and do not bar the equitable remedy of contract

82

reformation. *See Crompton v. Bruce,* 669 P.2d 930, 934–35 (Wyo.1983) (failure to read contract before signing it is not such negligence as to defeat reformation).

[¶ 33] McMurry Construction believes that it can prove, by clear and convincing evidence, that it reached an agreement with Ohio Casualty, through BW Insurance, for builder's risk coverage for the full replacement value of the two buildings, and that both sides to that agreement intended that full replacement value was $5,521,299.00. McMurry Construction contends that the policy was not written to reflect that agreement only because Ohio Casualty would not write a blanket policy covering both buildings, and that it was in the process of "breaking out" the values between the two buildings when the mutual mistake occurred. Reformation is an equitable remedy, and we see no compelling reason why McMurry Construction should not be allowed to seek enforcement of the contract, reformed to its original intent, solely because it did not read the policy upon receiving it. This case must be remanded to the district court for trial on the factual issues underlying the elements of the equitable doctrine.

### Motion to Amend Complaint

[¶ 34] As outlined above, the district court denied McMurry Construction's motion to amend its complaint. *See supra* ¶¶ 10 & 11. We review the denial of a motion to amend a pleading under the following standard:

A motion to amend a pleading under W.R.C.P. 15(a) "shall be freely given when justice so requires." However, a district court's decision to grant or deny a motion to amend is a matter best left to the judgment of that court and we will not reverse its decision absent an abuse of discretion. *Ekberg v. Sharp,* 2003 WY 123, ¶ 9, 76 P.3d 1250, 1253 (Wyo.2003).

*Ray v. St. Vincent Healthcare, Inc.,* 2006 WY 98, ¶ 7, 139 P.3d 464, 466 (Wyo.2006).

[¶ 35] The district court broke the new allegations of the proposed amended complaint into three categories, and denied amendment for a different reason as to each category. We cannot say that the denial was an abuse of discretion as to any of the three categories. First, the district court disallowed amendment for the purpose of adding additional tort and contract claims based upon the builder's risk policy under the theory that those claims, like those already presented, were barred by McMurry Construction's failure to read the policy. Second, the district court disallowed amendment for the purpose of adding a completely unrelated business auto claim on the ground that discovery on other matters was complete. Third, the district court disallowed amendment for the purpose of adding a claim under a separate CGL policy because the evidence showed that the CGL policy's liability coverage was never at issue, given McMurry Construction's rebuilding of the collapsed building before any legal demand was made upon it to do so.

[¶ 36] We cannot say that any of these decisions evidenced an abuse of discretion, where the appropriate exercise of discretion is characterized as "exercising sound judgment with regard to what is right under the circumstances and without doing so arbitrarily or capriciously." *Sanchez v. State,* 2006 WY 116, ¶ 25, 142 P.3d 1134, 1142 (Wyo. 2006). The district court presented a reasonable basis for each decision, based upon objective criteria. *See id.* The complaint was filed on November 14, 2005, and the motion hearing was on August 28, 2006, nearly ten months later. Discovery was complete in regard to the existing claims. The business auto policy issues were totally unrelated to the issues at hand, and the CGL policy, though related to the underlying facts, would have required renewed discovery because the claim questions would be different. The party seeking amendment has the burden of showing why the motion should be granted and that burden was not met in this case. The "ultimate issue is whether the court could reasonably conclude as it did." *Doenz v. Sheridan County Bd. of County Comm'rs,* 949 P.2d 464, 465 (Wyo.1997). In the instant case, it was not unreasonable for the district court to deny amendment of a complaint to add new issues to a ten-month-old case.

## CONCLUSION

[¶ 37] The district court appropriately granted summary judgment to BW Insurance and Ohio Casualty on the tort and contract causes of action contained in McMurry Construction's complaint because those causes of action were barred by McMurry Construction's failure to read the insurance policy documents sent to it. Summary judgment was not appropriate, however, on the equitable doctrine of reformation, which remains viable under the majority rule, which we adopt today. The summary judgments are reversed to that extent and this matter is remanded to the district court for further proceedings consistent herewith.

[¶ 38] The district court did not abuse its discretion in denying McMurry Construction's motion to amend its complaint and that denial is affirmed.