2009 WY 98

**AVIAT AIRCRAFT, INC., a Wyoming Corporation, Appellant (Defendant),**

v.

**Edward SAURENMAN, Appellee (Plaintiff).**

No. S–08–0143.

Supreme Court of Wyoming.

Aug. 14, 2009.

Representing Appellant: J. Kent Rutledge and James C. Kaste, of Lathrop & Rutledge, P.C., Cheyenne, Wyoming. Argument by Mr. Rutledge.

Representing Appellee: Marvin L. Tyler * and Ford T. Bussart, of Bussart, West & Tyler, P.C. Rock Springs, Wyoming, Peter Tolley of Foster, Swift, Collins & Smith, P.C., Grand Rapids, Michigan. Argument by Mr. Tolley.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

HILL, Justice.

[¶ 1] Appellant, Aviat Aircraft, Inc. (Aviat), seeks review of the district court's "Judgment in Accordance with Verdict." We will explain the details below, but we briefly note here that Aviat actually appealed from a decision of the district court that was made independent of, but which was subsumed into, the above identified "Judgment." We also note that Aviat filed a motion for new trial that stayed the time for filing the notice of appeal, and that Aviat did not file its notice of appeal until an appropriate time after the motion for new trial was denied. We will affirm the district court.

## ISSUE

[¶ 2] Aviat raises this issue:

Did the district court err when it determined as a matter of law that after wrongfully converting an aircraft owned by Aviat Aircraft, Inc., Mr. Saurenman became an involuntary bailee and that such involuntary bailment was a defense to Aviat's claim for conversion?

Saurenman restates the issue thus:

Based upon uncontroverted material facts, did the district court err in finding that Saurenman was an involuntary or gratuitous bailee, thereby precluding Aviat's claimed property damages to its airplane from exposure to elements and deterioration over time?

## FACTS AND PROCEEDINGS

[¶ 3] This case has a long procedural history. Boiled down to its essence, there are two individuals and a corporation who figure in this story. The corporation is Aviat, of course. Saurenman worked for Aviat, which was a corporation wholly owned by Stuart Horn (Horn), who was its president and the person in control of its day-to-day operations. Aviat builds aerobatic airplanes, other small aircraft such as those used by bush pilots in Alaska, as well as "kit" airplanes for the truly adventurous. Saurenman worked for Aviat as an "engineer" who designed, built, and flew many types of aircraft. His work experience included working for other aircraft manufacturers, including some that produced personal and military aircraft (e.g., Learjet and Raytheon). Saurenman met Horn in 1995–96, and Horn hired him to work for Aviat in 1997. That employment relationship lasted until early 2004, when Saurenman chose to treat Horn's abusive conduct toward him as a constructive discharge and left that employment.

[¶ 4] Horn tried to impeach Saurenman's credibility by questioning him as to why one of the aircraft manufacturers Saurenman claimed to have worked for had no record of him ever being an employee. Without missing much of a beat, Saurenman explained that he worked for a subcontractor which worked directly for that manufacturer on site. Saurenman produced an internal phone book used by that aircraft manufacturer which showed his name and phone number for the time he claimed to have worked there. Horn also tried to make much of the fact that Saurenman had very little formal education, apparently to attempt to show that he had deceived Horn about his qualifications to work for Aviat. However, once again the record is devoid of any direct evidence that Saurenman purposely or maliciously ever tried to deceive Horn, or any one else, about the level of his academic achievements. He was not a degreed engineer,

* Order Allowing Substitution of Counsel entered October 14, 2008.

indeed, he did not have a high school diploma, although he did have a GED.

[¶ 5] Both of Saurenman's parents were aerobatic pilots and he grew up in that world. He built his first aerobatic plane as a teenager and had worked in one way or another in the design, building, and flying of aircraft of various sorts for his entire work life. Interestingly enough, the two principal designers of the bulk of the aircraft Aviat produced were both individuals who were not "college graduate" engineers, but rather experienced pilots intimately familiar with the design and building of the types of aircraft Aviat produced.

[¶ 6] The litigation that leads us to this juncture was initiated by Saurenman with the filing of a multi-count complaint in the district court on May 13, 2004. Saurenman asserted that he was approached by Horn (on behalf of Aviat) in 1997, and was hired to work for Aviat as an "advanced design engineer." Saurenman contended that he was either fired, or "constructively discharged," from Aviat in early 2004, when Horn became very angry after a meeting Aviat was hosting at its Afton headquarters with officials from the Federal Aviation Administration (FAA). Those meetings related to a new aircraft that Saurenman was designing known as the A–4000. That aircraft was essentially a modified version of a two-seat plane Aviat had manufactured for years, which was being enlarged to carry four passengers. Horn was frustrated at that time because he thought the progress of the project had been too slow, as well as because he "perceived" that Saurenman had been late for that meeting with the FAA that day. Saurenman explained in his testimony that he had forewarned Horn that he would necessarily be delayed in arriving at the meeting and had told Horn he would have to take care of the first half-hour or so of the meeting—much of which was more social that substantive—i.e., coffee, introductions, etc. According to Saurenman, after that meeting was over, Horn flew into a rage that included him seriously damaging one of the prototype A–4000 aircraft by repeatedly throwing heavy objects at it, screaming and hollering, and dangerously (to those persons present) accelerating his pickup truck out of the hangar in which the aircraft was being assembled. Horn did not dispute that an event much like that described by Saurenman occurred, although he did describe it in terms more favorable to his point of view, just as, perhaps, Saurenman described it in terms more favorable to his point of view.

[¶ 7] Immediately following this event, Saurenman left Afton, as he had planned to do before Horn's "tantrum" occurred, and returned to the State of New York, where he was doing his work for Aviat. However, shortly after returning to New York, Saurenman informed Horn that he would no longer work for Aviat. At that point in time, Saurenman had possession of two planes that were titled in Aviat's name, a Sukhoi plane and the Monocoupe. At that time those planes were being housed in a hangar in New York that was leased by Aviat. Horn e-mailed Saurenman and directed that he return both planes, as well as an extensive list of other Aviat property Horn claimed Saurenman had in his possession. By the time this litigation came to trial, the only property still in dispute was the Sukhoi and the Monocoupe. With respect to the Monocoupe, Saurenman had "revised" his position from one that he "owned" the Monocoupe, to one that he was entitled to an "interest" in the Monocoupe to the extent that he had owned the skeletal airframes and jigs (a sort of frame) that he had built before he went to work for Aviat, and which had been transported to Afton for completion of the plane. Eventually, Saurenman was determined not to have any interest of any sort in the Monocoupe.

[¶ 8] The employment "contract" between Horn and Saurenman was in many ways quite informal and the closest it ever came to being formalized was a draft letter from Horn to Saurenman that contained marginal notations made by Saurenman, but which was never signed by Horn. Saurenman claimed that they reached an agreement to that effect and Horn denied it. The record fully supports a conclusion that that letter best summarized their contractual relations, which was also the jury's conclusion at the end of the trial. In order to fill in the gaps, it is necessary to look to the testimony of

both Horn and Saurenman and their views on that "contract," which frequently were directly at odds with one another. It is of some considerable significance to the resolution of the very limited issue that we must address in this appeal that Saurenman lived with Mr. Horn and his family, in their home in Afton, during almost all the time that he worked in Afton for Aviat. During that time they developed a very close personal relationship, as well as a fairly close working relationship.

[¶ 9] In his complaint, Saurenman contended:

1. *Count I—Breach of Contract (All Defendants).* The claims detailed in this section of the nine-page complaint had to do with the terms and conditions of Saurenman's employment with Horn and Aviat.

2. *Count II—Breach of Contract (Defendant Aviat).* This claim had to do with Saurenman's ownership of the rights, title, and interest in the design, the data, and the rights to manufacture the type of aircraft known as the Pitts S1–11 (Superstinker). On January 18, 1996, Saurenman sold his rights to that aircraft to Aviat. Sauernman contended that Aviat agreed to pay Sauernman $240,000.00 for the rights to that plane, but only paid $130,000.00 of that amount.[1]

3. *Count III—Conversion by Aviat of the plans for the Superstinker airplane.* This claim is closely interrelated with Count II, immediately above.

4. *Count IV—Conversion of Sukhoi Aircraft (All Defendants).* This claim arose because Saurenman wanted to buy a Russian-made aerobatics plane known as a Sukhoi. The Sukhoi was to be for his personal use and he was to own it, once he had paid for it. Horn agreed to have Aviat use its credit to buy the plane, and then Saurenman was to make payments on it until he had paid off that "loan." Saurenman did not pay off that loan, but other deals were struck between Saurenman and Horn in the intervening years which were intended to effect a forgiveness by Aviat of any part of that loan

that was yet unpaid. We briefly note here that the jury agreed with Saurenman that he owned the Sukhoi aircraft (and that Aviat did not), although that was disputed by Horn and Aviat until the very end of this litigation.

5. *Count V—Conversion of Monocoupe Aircraft (All Defendants).* Saurenman owned the "Type Certificate" for the Monocoupe. The "Type Certificate" was registered with the Federal Aviation Administration and it included all the type data, drawings, and plans (there is no dispute about those facts). The Monocoupe was a 1930's vintage plane and the data and plans were in a format well-known to that time period, but none of those plans had been "translated" via computer assisted design (CAD) into a modern format. Saurenman had begun work on building two Monocoupe aircraft before he went to work for Aviat, and Aviat had potential buyers who were interested in acquiring such a plane. Saurenman claimed that he owned or, as it was later re-described, had a financial interest or stake in, one of the Monocoupe aircraft. He spent much of his initial time at Aviat working on those planes. Saurenman claimed that Aviat registered the Monocoupe in the name of Aviat without his permission and without any colorable right.

6. *Count VI—Conversion Monocoupe Type Data (All Defendants).* Saurenman contended that Aviat retained much of his proprietary data relating to the Monocoupe after he was discharged by Horn.

7. *Count VII—Abuse of Process (Defendant Horn).* When Saurenman was fired in early 2004, he was working most of the time in New York State on a new project that Horn had put Saurenman in charge of. Horn had rented office space in New York for Saurenman to use because Saurenman felt he was wasting too much time flying to and from New York, to Wyoming. For the purpose of commuting to and from New York to Wyoming, Horn provided Saurenman the use of one of the Monocoupe prototypes. In

---

1. Horn and Aviat obtained the rights to the Superstinker design in 1996, before Saurenman went to work for Aviat, while Saurenman worked for (and partially owned) Kansas Aero Design. It was this transaction that brought the two men together and which led to Saurenman going to work for Horn.

addition to the Monocoupe, Saurenman also had possession of the Sukhoi aircraft at his home in New York. Saurenman claimed he had partly paid for that latter plane and, to the extent he had not paid for it, that it was a substitute for part of his compensation package which Horn had not paid to him. After Saurenman left Aviat in early 2004, he kept both aircraft in his possession. Horn went to police authorities, first the local county sheriff and then the FBI, accusing Saurenman of stealing the two planes. Neither police agency opted to prosecute because Saurenman had obtained his possession of the aircraft legally and Horn admitted that.

[¶ 10] In response to Saurenman's complaint, on June 18, 2004, Aviat and Horn filed a voluminous answer and counterclaim. One of the first significant delays in this litigation came about when, on October 1, 2004, Horn and Aviat filed a "Notice of Removal" in the United States District Court for the District of Wyoming on the basis that an amendment to Saurenman's complaint gave rise to a copyright infringement claim. Although some proceedings continued in the state district court in the meantime, in a November 10, 2004 order, the federal district court directed that all "records and proceedings" be filed with that court. In a September 15, 2005 order, the matter was remanded back to the state district court because Horn and Aviat failed to demonstrate proper removal jurisdiction, because all of Saurenman's claims were state law claims, and because what Horn and Aviat deemed to be a copyright claim was only a traditional state-law conversion claim. That order also concluded that any further claims with regard to the asserted copyright claim would have to be vindicated in a separate civil action in federal court.

[¶ 11] While this case was in the process of going to and from the federal district court, the state district court issued an October 14, 2004 order resolving a motion for preliminary injunction filed by Horn and Aviat. That order covered a lot of ground, but for purposes of this appeal, it was important because it temporarily settled what was to be done with the Monocoupe aircraft:

4. [Monocoupe]. ***By October 4, 2004, Saurenman shall relinquish *possession and control* of a specific aircraft known as [Monocoupe] to a receiver*** agreed upon by the parties and paid for by [Aviat/Horn]. The receiver shall immediately hangar [that aircraft] at a hangar to be chosen by Aviat, which hangar may be located anywhere in the United States, so long as said hangar is not on property owned by Aviat. The receiver's duties shall include, possessing [the aircraft], ensuring that it is secure, hangared in a hangar that is in good repair, and issuing periodic reports to the parties detailing the condition of the [aircraft]. Aviat shall pay the cost of transporting, hangaring and insuring the [aircraft]. The parties shall not have access to [the aircraft] while it is in the possession of the receiver. [Emphasis added.]

The district court orally issued this order in July of 2004, but it was not reduced to writing and prepared for the district court's signature until October 2004.

[¶ 12] Over the course of the litigation, Saurenman and Horn stipulated to the dismissal of many of the claims and when the jury trial came to an end on April 23, 2007, the verdict the jury had to decide upon was fairly simple:

1. Did Aviat Aircraft, Inc., and Edward Saurenman enter into a contract which required Aviat Aircraft, Inc., to pay Edward Saurenman a commission on the sale of all new products Edward Saurenman designed and on all products that were redesigned under Mr. Saurenman's direction?

NO _____     YES __X__

2. If the answer to Question No. 1 is "YES," do you find that Mr. Saurenman performed the design work or directed the redesign work which entitled him to a compensation on any of the following products?

| | | | | |
|---|---|---|---|---|
| Husky A–1A | NO | X | YES | |
| Husky A–1B | NO | X | YES | |
| Pitts S–2C | NO | | YES | X |

3. If you have answered "YES" to Question No. 1 and "YES" to any of the products identified in Question No. 2, for what

period of time do you find that Mr. Saurenman is entitled to receive [a] commission?

From 5/15/2003      To 2/27/04

4. What amount is Mr. Saurenman entitled to receive as commission?

Husky A–1A      $    0

Husky A–1B      $    0

Husky S–2C      $ 6994.64

5. Did Aviat Aircraft, Inc. and Edward Saurenman enter into a contract which required Aviat Aircraft, Inc. to pay Edward Saurenman an annual salary of $150,000.00 beginning May 15, 2003?

NO _____          YES   X

6. If you answered "YES" to Question No. 5, what is the amount of salary that was not paid to Mr. Saurenman that should have been paid as a result of the raise in annual salary from May 15, 2003 to February 27, 2004?

$  58,128.61

7. Did Aviat Aircraft, Inc., and Edward Saurenman enter into a contract which required Aviat Aircraft, Inc., to pay Edward Saurenman a "sign-on-bonus" of $50,000.00?

NO _____          YES   X

8. What amount, if any, does Edward Saurenman owe to Aviat Aircraft, Inc. for money Aviat Aircraft, Inc. paid to Edward Saurenman for prepaid commission, royalties or salary advances?

$    0

9. Which party is the owner of the Sukhoi aircraft?

Aviat Aircraft _____      Mr. Saurenman   X

[¶ 13]  As can readily be seen, to the extent the issues raised in the complaint and the counterclaim were not settled between the parties, the jury ruled almost completely in favor of Saurenman. The jury's verdict was not the end of this case, however. Due to an oversight, there was still one issue that was undecided. That issue was which party was responsible for the damage/deterioration the Monocoupe had suffered while sitting in Saurenman's hangar pending trial (2004–2007). A little bit more background is necessary at this point in our discussion. After the jury rendered its verdict, it was pretty much accepted by all that Saurenman did not convert either of the aircraft to his own use, rather he came into possession of them lawfully. Not long after he was "constructively discharged" and returned to his work place in New York to collect his belongings/possessions, he moved to North Carolina. At that residence he had a small landing strip and a hangar with three sides and a roof, but which was open to weather on the front. He took both the Monocoupe and the Sukhoi with him to that location.

[¶ 14]  The only issue in this appeal is how the injunction issued by the district court on October 7, 2004, which we have set out in detail above, affected the responsibility of the parties to care for the Monocoupe. The preliminary injunction represented the relief Horn and Aviat had strived to obtain from the very outset of this litigation. However, once the relief was granted, Horn and Aviat did not act on it, but rather the plane just sat in Saurenman's hangar for the next three years while the proceedings languished, first in federal district court, and then back in the state district court. In their brief, Horn and Aviat assert that: "Neither party had requested that the aircraft be placed into the hands of a receiver, and the parties had no input as to the implications of the Order." However, the Preliminary Injunction itself demonstrates that the ruling favored Horn and Aviat's claim of ownership and neither Horn nor Aviat sought any relief from it or a modification of the injunction. Because of Horn's and Aviat's inaction, Saurenman, on the other hand, was deprived of any "possessory rights" he might have had, as well as any right of access to the Monocoupe, even though it was located on his property.

[¶ 15]  After the jury reached its verdict on April 23, 2007, things remained in limbo until the district court issued a decision letter on October 29, 2007, because all parties and the district court itself, were unsure about the status of the Monocoupe and who bore the responsibility for the deterioration of the aircraft during the time between the district court's issuance of the October 4, 2004 Preliminary Injunction, and the issuance of the

jury's verdict in this case. It was Horn's and Aviat's expectation that the district court would rule both on Saurenman's contention that he was an "involuntary" or "gratuitous" bailee, as well as on the amount of damages that had occurred to the plane.[2] The district court's decision letter provided:

There has been confusion in the Court's mind regarding [Saurenman's] motions for summary judgment wherein [he] contends that his possession of the Monocoupe was [as] an involuntary bailee. I initially denied the motion because I had forgotten the details of the stipulation made by the parties regarding how the damage issue would be resolved and assumed that the parties had agreed to let the special master decide if [Saurenman] was an involuntary bailee, along with the damages, if any. However, in a telephone conversation with [counsel], both agreed that it was contemplated that I would decide the involuntary bailment issue as a matter of law based on the uncontroverted facts. I had my court reporter type the oral stipulation and agree that is what the parties intended. A copy of the oral stipulation is appended hereto. I appreciate counsels' patience and help in refreshing the Court's recollection.

[Horn and Aviat] claim[ ] its Monocoupe was damaged as a result of it being stored in an open hangar under [Saurenman's] control during the course of this litigation. [Saurenman] contends that he held the aircraft as an involuntary bailee because [Horn and Aviat] did not get the plane as authorized by the Court in a preliminary order and [Saurenman] was merely holding it until [Horn and Aviat] got it.

The Court has taken judicial notice of the matters of record in this case, specifically its order on [Horn's and Aviat's] motion for preliminary injunction, [Saurenman's] countermotion dated October 7, 2004, the affidavits accompanying the motions, the trial testimony of the witnesses, and the exhibits and the jury verdict.[3]

The uncontested material facts are these:

1. By virtue of the jury verdict, [Horn and Aviat are] the owner[s] of the Monocoupe aircraft.[4]

**2.** The facts pertaining to the issue of the "damages/deterioration" of the Monocoupe were just one of the stumbling blocks that came up in this case—and both the parties and the district court were very upfront about conceding that the proceedings had been fraught with human error. The problem began when Saurenman's damages witness testified out of order because of confusion about trial scheduling. That testimony was received by the district court and it indicated that the damages, if any, to the Monocoupe were minimal. When it was Horn's and Aviat's turn to present damages evidence, the district court ruled that their "expert" was not qualified to give an opinion about the damages. That left no evidence at all as to damages to support Horn's/Aviat's theory. It was at this point in time that the district court agreed that it would decide if Saurenman had any responsibility at all for the "damages/deterioration" of the Monocoupe. Only if Saurenman was found to be so responsible was the issue of damages to be assigned to a special master for resolution.

**3.** The entire record is not before this Court. However, we discern from the briefs and the argument that the parties are in agreement that this Court has all of the record that is pertinent to the appeal before it.

**4.** Actually, this portion of the decision is not accurate. The question of the ownership of the Monocoupe was not presented to the jury. During the course of the litigation, Saurenman's position evolved from one of claiming ownership, to one of owning an interest in the aircraft, and finally conceding that he did not own the aircraft at all, but should be paid for component parts that he owned before he went to work for Aviat and which were incorporated into the plane. The district court changed the terms of the preliminary injunction in an order filed of record on January 31, 2007, giving Aviat the full right to possess the Monocoupe, although it had had the right to possess it through a receiver for over two years. Our review of the record was unable to pinpoint when this particular order was decided by the district court, but it was not an item on the verdict form—on the other hand, no one now disputes the fact that Horn and Aviat were given the right to possession before an appealable order was entered in the form of the Judgment on Jury's Verdict. Aviat actually went and exercised its right to possess the plane in May of 2007. Horn and Aviat took several different positions with respect to that plane, claiming that it was too expensive to hire a receiver, claiming that Saurenman agreed to keep it and take care of it, and claiming that Saurenman's persistence in making a claim that he had an "economic interest" in the Monocoupe belied his claims that Horn and Aviat had had the right to its possession since October of 2004.

2. [Saurenman] came into possession of the aircraft lawfully. He constructed it while he was an Aviat employee, with Aviat's consent. As an Aviat employee, [Saurenman] used it as a mode of transportation and as a demonstration while promoting the aircraft for Aviat. While at trial, the parties disagreed as to whether or not [Horn and Aviat] owned the aircraft, the jury resolved that question.[4]

3. After [Saurenman] left [Horn's and Aviat's] employ, the parties disputed the ownership of the Monocoupe. The claim of ownership to the Monocoupe and the Sukhoi was not readily apparent. Both parties filed motions for preliminary injunction involving the Monocoupe. **A hearing on the motions was held in July of 2004 and a bench decision was made. However, the order reflecting the bench decision was not submitted by [Horn's and Aviat's] counsel for signature until October 7, 2004.** The order directed that [Saurenman] relinquish possession of the Monocoupe "to a receiver agreed upon by the parties and paid for by [Horn and Aviat]." [Emphasis added.]

4. [Horn and Aviat] chose to leave the Monocoupe at [Saurenman's] hangar in North Carolina because [they] did not want to spend the funds to move the aircraft to another location and pay the expenses and rent associated with the receiver.

5. Neither [Horn and Aviat] nor [Saurenman] ever sought to modify the October 2004 order.

6. The Monocoupe aircraft remained at [Saurenman's] hangar from October 4, 2004 until the trial. During this time, [Saurenman] took no action with respect to the Monocoupe other than to allow it to sit in the hangar, to wash it, and to allow the parties' expert witnesses to inspect it.

7. There is no evidence of any willful abuse or willful destruction of the Monocoupe while in [Saurenman's] possession.

### Discussion

As a result of the Court's order on the motions for preliminary injunction, [Saurenman] had no obligation to possess the aircraft. [Horn and Aviat] prevailed on part of [their] motion to dispossess [Saurenman]. [Horn and Aviat] had the right and obligation to have the aircraft removed to a hangar of [their choice] by paying the cost of moving the aircraft and of storing it in a new location. The fact that the aircraft remained in [Saurenman's] hangar following the Court's order on the motions for preliminary injunction is the result of [Horn's and Aviat's] choice—not [Saurenman's].

### Duty

The existence of a duty is a matter of law to be determined by the Court. *E.g. John Q. Hammons Inc. v. Poletis*, 954 P.2d 1353, 1356 (Wyo.1998). If there is no duty of care owed, then there is no course [*read* "cause"] of action. *E.g. Davis v. Black Hills Trucking, Inc.*, 929 P.2d 532, 534 (Wyo.1996).

A bailee is one who holds possession of property of another, but not title. BLACK'S LAW DICTIONARY 141 (6th Edition 1990).

"A constructive or involuntary bailment arises where the person having possession of a chattel holds it under such circumstances that the law imposes a burden on him the obligation of delivering it to another, where a person has lawfully acquired possession of personal property of another otherwise than by a mutual contract of bailment, or where a person has lawfully acquired the possession of personal property of another and holds it under circumstances whereby he should, on princip[les] of justice, keep it safely and restore it or deliver it to the owner." *E.g. Hoblyn v. Johnson*, 55 P.3d 1219, 1229, 2002 WY 152 citing 8 C.J.S. *Bailments* § 15, at 237.

In this case, [Saurenman] held [Horn's and Aviat's] aircraft first as an employee of [them]. [Saurenman] also retained possession believing he owned the aircraft. Pursuant to the Court's order dated October 7, 2004, [he] had the obligation of relinquishing possession to the receiver named by [Horn and Aviat] for storage pending conclusion of this litigation and determination

of ownership. The law (i.e. the Court's order) imposed upon him the burden of delivering it to the receiver. [Saurenman] originally acquired possession of the aircraft lawfully, with the consent of Aviat, who was ultimately declared the owner. However, following the Court's preliminary order, [he] had no choice but to hold the aircraft by keeping it in his hangar until the receiver obtained possession of it or until the jury determined the rightful ownership. There is no evidence that following the Court's order [Saurenman] would not have relinquished the aircraft to the receiver designated by [Horn and Aviat] if someone had come to recover [it]. The Court concluded that from the date of its preliminary order until possession of the aircraft was relinquished to [Horn and Aviat] in May of 2007 following the trial, [Saurenman] was an involuntary bailee.

The duty of an involuntary bailee is:

An involuntary bailee, as long as his lack of volition continues, is not under the slightest duty to care for the subject of the bailment, and cannot be held, in respect to custody, for what would even be the grossest negligence in the case of voluntary bailment, but he may owe some measure of care if he has knowledge that the property has come into his possession. In any event, the involuntary bailee must refrain from wanton, reckless or willful acts, which would injur[e] or destroy the property. 8 C.J.S. Bailments, § 48(a) at 280.

Damages are recoverable as a result of injury to or destruction of property caused by the willful or reckless acts of another. There is no evidence of damage to the aircraft as a result of wanton, reckless or willful acts of [Saurenman]. Accordingly, [he], as a matter of law, has not breached any duty of care owed by an involuntary bailee to the owner of the aircraft. [Horn's and Aviat's] counterclaim for damages to the Monocoupe is dismissed.

## DISCUSSION

### Standard of Review

[¶ 16] Identifying the standard of review that should apply in this case is in itself problematic. Most of the issues were decided by a jury after a jury trial, but the issue raised in this appeal was decided by the district court in what appears to have been a summary judgment order. Horn and Aviat contend, however, that what finally happened here was really a trial to the court and that is the standard of review that should apply. As a practical matter, we agree that that is as close as we can get to an appropriate standard of review, given the highly unusual set of proceedings we are called upon to decipher. Thus, we agree that:

We review a district court's decision following a bench trial according to the following standards:

The factual findings of a judge are not entitled to the limited review afforded a jury verdict. While the findings are presumptively correct, the appellate court may examine all of the properly admissible evidence in the record. Due regard is given to the opportunity of the trial judge to assess the credibility of the witnesses, and our review does not entail re-weighing disputed evidence. Findings of fact will not be set aside unless they are clearly erroneous. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.

*Mullinnix LLC v. HKB Royalty Trust,* 2006 WY 14, ¶ 12, 126 P.3d 909, 916 (Wyo. 2006) (citations omitted). Further, with regard to the trial court's findings of fact,

[W]e assume that the evidence of the prevailing party below is true and give that party every reasonable inference that can fairly and reasonably be drawn from it. We do not substitute ourselves for the trial court as a finder of facts; instead, we defer to those findings unless they are unsupported by the record or erroneous as a matter of law.

*Id.* The district court's conclusions of law however are subject to our de novo standard of review. *Id.*

*Addison v. Dallarosa–Handrich,* 2007 WY 110, ¶ 8, 161 P.3d 1089, 1091 (Wyo.2007).

*In re Estate of Thomas,* 2009 WY 10, ¶ 6, 199 P.3d 1090, 1093–94 (Wyo.2009). Moreover, we may affirm the district court upon any valid basis appearing in the record. *Arnold v. Day,* 2007 WY 86, ¶ 14, 158 P.3d 694, 698 (Wyo.2007).

## Law of Bailments (vs.Conversion)

[¶ 17] Horn and Aviat persisted throughout the proceedings below, and in this appeal, in characterizing Saurenman's actions with respect to the Monocoupe as conversion or outright theft, and that that conversion had persisted for over three years despite the district court's preliminary injunction. No fact finder found that Saurenman converted the Monocoupe, whether that term is used in its criminal sense or its civil law sense. To the extent fact finding was done, the jury determined that Saurenman owned the Sukhoi aircraft that Horn and Aviat also accused Saurenman of converting. The district court found "from all the materials in the record" that Saurenman came into possession of the Monocoupe lawfully, and none of the district court's findings can be read to even suggest that Saurenman's "lawful possession" ever transformed from lawful possession to conversion by his refusal to return the plane "at once," when Horn and Aviat demanded that he do so in an e-mail. Horn and Aviat also contend that Saurenman "vigorously resisted" their efforts to regain possession of the Monocoupe, but the record will support only that Saurenman so resisted for a few months in 2004, and beginning in July of 2004, he was unequivocally divested of any possessory rights with respect to it. In short, Horn and Aviat present only those facts of record which tend to support their view of the case and ignore almost entirely the evidence presented by Saurenman. The governing standard of review requires that we credit the district court's findings unless they are clearly erroneous—and here we must also take into account that, not only did the district court believe Saurenman's testimony (and largely discount Horn's), but the jury's verdict which underlies the district court's appealable order also credited Saurenman's testimony and largely discredited that of Horn.

[¶ 18] This case is not destined to make an enduring contribution to the law that pertains to bailments, whether the bailment under review is a purely contractual bailment or one of the more modern incarnations of bailment that relies on tort principles of negligence for its vitality, rather than on contract principles. We recite below some of the law relating to that subject to the extent it pertains to this specific case.

[¶ 19] Although "bailments" are traditionally discussed in terms of a "contract" or "promise," where there is no express contract, a variety of hybrid theories have stepped in to fill in some of the gaps left where there is no express contract. Of course, here there was no express bailment contract. One of those theories is described in 4 Williston on Contracts, *Gratuitous undertakings, in general,* § 8:1 at 3–22 (4th ed.) (2008 and Supp.2009). More detail about this subject is found in 19 Williston on Contracts, §§ 53:1 through 53:13 (2001 and Supp. 2009). With respect to a gratuitous bailment, a bailee "is liable for damage caused only by his or her gross negligence." *Id.,* § 53:8; 8 C.J.S. *Bailments* § 79 (2005). A gratuitous bailment assumes that the bailee has notice or knowledge that he has possession of the disputed goods, and that is the case here. Where possession of goods is imposed upon a person without his permission, that person is known as an involuntary bailee, and he "is under a duty of reasonable care to protect the receptacle in the condition in which it is received." 19 Williston, *supra,* § 53:9. There are other forms of bailment as well, but none that are more clearly applicable than the two described immediately above. *Id.,* §§ 53:10 through 53:13.

[¶ 20] Another matter that deserves mention is the creation of a "constructive bailment." A constructive bailment arises where a party having come into possession of the personal property of another without that party being specifically entrusted with the property as a bailee. See Walter H. Sekela, *Constructive Bailment,* 39 P.O.F.2d 501 (1984 and Supp.2008). However, the district court properly dismissed this potential theory when it found that, although Saurenman lawfully came into possession of the Monocoupe, to the extent he had any right to possession, he was deprived of that right by

the district court's preliminary injunction. See generally, Robert A. Brazener, Annotation, *Liability of Bailee of Airplane for Damage Thereto,* 44 A.L.R.3d 862, § 2 (1972 and Supp.2009) (suggesting that Saurenman would have owed only a "slight" duty of care to Horn and Aviat in the instant circumstances).

[¶21] In sum, to the extent the district court made finding of facts, we conclude that none of them was clearly erroneous. Likewise, we conclude that the district court's application of the law to the facts (whether those that were undisputed or those about which there is some contention as to their "clearly erroneous" status) was correct, although perhaps for reasons that vary somewhat from those articulated in the district court's decision letter. The terminology used by the parties and the district court may have been a bit too loose (and that might well be true of this opinion too); however, the result in this case is fully consistent with the law generally applicable to circumstances such as those that arose here.

## CONCLUSION

[¶22] The district court's appealable order is affirmed in all respects.