2010 WY 57

OHIO CASUALTY INSURANCE COMPANY, an Ohio corporation, Appellant (Defendant),

v.

W.N. McMURRY CONSTRUCTION CO., a Wyoming corporation, Appellee (Plaintiff).

W.N. McMurry Construction Co., a Wyoming corporation, Appellant (Plaintiff),

v.

Ohio Casualty Insurance Company, an Ohio corporation, Appellee (Defendant).

W.N. McMurry Construction Co., a Wyoming corporation, Appellant (Plaintiff),

v.

BW Insurance Agency, Inc., and Ohio Casualty Insurance Company, an Ohio corporation, Appellees (Defendants).

Nos. S-08-0163, S-08-0164, S-08-0165.

Supreme Court of Wyoming.

May 4, 2010.

Representing Ohio Casualty Insurance Company: Patrick J. Murphy and Scott P. Klosterman of Williams, Porter, Day & Neville, P.C., Casper, Wyoming. Argument by Mr. Murphy.

Representing W.N. McMurry Construction Co.: W.W. Reeves and Anna Reeves Olson of Park Street Law Office, Casper, Wyoming. Argument by Mr. Reeves.

Representing BW Insurance: Billie L.M. Addleman and Richard A. Mincer of Hirst Applegate PC, Cheyenne, Wyoming. Argument by Mr. Mincer.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, *JJ.*

GOLDEN, Justice.

[¶ 1] These three consolidated appeals arise out of W.N. McMurry Construction's (McMurry Construction) legal action to recover for two separate incidents involving two separate insurance policies. Both policies were issued to it by Ohio Casualty Insurance Company (Ohio Casualty). BW Insurance Agency (BW Insurance), an independent insurance agency, was the procuring agent for both policies.

[¶ 2] The first subject insurance policy is a "Builder's Risk" policy. McMurry Construction suffered a covered loss during the construction of a commercial building. McMurry Construction filed its claim with Ohio Casualty, only to discover its policy limits were precipitously lower than it had assumed had been procured. The underlying legal action proceeded to a bench trial on McMurry Construction's claim seeking reformation of the contract of insurance to reflect increased policy limits. The district court agreed with McMurry Construction and ordered the requested reformation of the builder's risk policy.

[¶ 3] In appeal number S–08–0163, Ohio Casualty appeals the district court's decision requiring reformation. We reverse this decision. In appeal number S–08–0164, McMurry Construction appeals the trial court's calculation of interest in its award under the builder's risk policy action. Because McMurry Construction is no longer the prevailing party in that underlying litigation, and therefore no longer entitled to damages, appeal number S–08–0164 is dismissed as moot.

[¶ 4] The second policy at issue is a "Business Auto" policy. A McMurry Construction employee was involved in a motor vehicle accident. Ohio Casualty denied the resulting claim under the business auto policy, stating the particular employee involved in the accident was expressly excluded from

coverage. Although a written exclusion existed, McMurry Construction claimed BW Insurance, while acting as the agent for Ohio Casualty, explicitly stated the employee was a covered driver, thus binding Ohio Casualty to coverage.

[¶ 5] McMurry Construction brought certain tort and contract actions against BW Insurance. BW Insurance moved for summary judgment on these causes of action, which the district court granted on the grounds that they were barred by McMurry Construction's failure to read the policy.

[¶ 6] McMurry Construction also sought reformation of the business auto policy as against Ohio Casualty. After a bench trial, the district court found BW Insurance did represent to McMurry Construction that the driver at issue was covered under the business risk policy. The district court also, however, found that BW Insurance was not acting as Ohio Casualty's agent when it made this representation. The district court consequently declined to order reformation of the business auto policy.

[¶ 7] In appeal number S–08–0165, McMurry Construction appeals the district court's decision to not require reformation of the business auto policy. It also appeals the summary judgment granted to BW Insurance on contract and tort actions McMurry Construction had filed against BW Insurance in regard to BW Insurance's procurement of the policy. We affirm these decisions.

### APPEAL NUMBER S–08–0163

#### ISSUES

[¶ 8] Ohio Casualty presents the following issues:

A. Did the district court err in reforming this builder's risk policy to have $5.5M policy limits?

1. Did the district court err when it never analyzed the first element of reformation established in *McMurry Const. v. Community First Ins.,* 2007 WY 96, 160 P.3d 71 (Wyo.2007)?

2. Did the district court err when it confused BW and Ohio Casualty's mistake and miscommunication in *reaching* their antecedent agreement with the doctrine of mutual mistake?

3. Did the parties err in *reaching* their antecedent agreement or in *drafting* the written instrument?

4. Did the district court err when it found there was an antecedent agreement that the buildings be insured "for full value?"

5. Did the district court err when it ruled that the broker was acting on behalf of the insurer, not the insured, when the miscommunication and mistakes occurred?

6. Did the district court err when it found that the insurer called the broker into action and was controlling the broker's function when the miscommunication occurred?

[¶ 9] McMurry Construction reframes the issues thusly:

I. Whether the district court's finding that the parties reached an antecedent agreement is correct.

II. Whether Ohio Casualty is bound by the acts of its agent undertaken within the scope of its agency.

[¶ 10] Ohio Casualty filed a reply brief:

I. New issues and new arguments raised by McMurry in its brief which are addressed in this reply brief

A. Did BW make an antecedent agreement with McMurry, binding on Ohio Casualty, to insure these two buildings for $5.5M or for full value?

B. Was BW acting as McMurry's agent, or as Ohio Casualty's agent, when it made the alleged antecedent agreement?

C. Even if BW made an antecedent agreement for $5.5M, and even if this Court finds that BW was acting as Ohio Casualty's agent when it made that agreement, did BW act beyond its $1M binding authority when it made this alleged antecedent agreement for $5.5M?

#### FACTS

[¶ 11] This is the second appearance of this dispute before this Court. In the earlier appeal, we summarized the context of the dispute:

Early in 2005, McMurry Construction obtained a contract from the State of Wyoming to construct two steel buildings at the State Fairgrounds in Douglas. McMurry Construction's bid was $5,521,-299.00—$,368,761.00 for a livestock pavilion and $2,298,759.00 for a multi-purpose show center. The contract required McMurry Construction to obtain builder's risk insurance covering 100% of the contract amount. Anticipating this requirement, McMurry Construction had turned to BW Insurance, the agency it typically used, to procure premium estimates for the builder's risk and other insurance and bonding requirements of the project. BW Insurance's employees estimated a premium of $8,415.00 for the builder's risk insurance on the originally estimated contract price of $4,500,000.00. McMurry Construction used that premium estimate in calculating its bid.

Upon learning that McMurry Construction would be awarded the contract, BW Insurance sent an insurance application to Ohio Casualty, seeking "blanket" builder's risk coverage for the two buildings because both buildings were to be insured under the same contract number. The contract amount was stated in the application to be $5,524,000.00. Because Ohio Casualty does not issue "blanket" builder's risk policies—meaning one limit covering multiple buildings—Ohio Casualty asked BW Insurance to break out the values of the two buildings. In turn, BW Insurance contacted McMurry Construction to obtain those figures. Misunderstanding what information was being sought, a McMurry Construction employee mistakenly gave BW Insurance the invoice amounts for the steel packages—$603,003.00 for the livestock pavilion, and $365,147.00 for the multi-purpose show center. Those figures were then relayed from BW Insurance to Ohio Casualty, where they were inserted as the operative coverage amounts in the builder's risk policy. The premium charged to McMurry Construction was, as a result, reduced from the estimate of $8,415.00 to $3,659.00.

BW Insurance mailed a certificate of insurance to McMurry Construction on March 2, 2005, showing the amount of builder's risk coverage to be $968,150.00. The policy was mailed to McMurry Construction a few days later, once again containing the builder's risk coverages of $603,003.00 and $365,147.00 for the two buildings. On March 15, 2005, BW Insurance faxed another copy of the certificate of insurance to McMurry Construction at the latter's request, and on March 18, 2005, again at McMurry Construction's request, BW Insurance faxed to it a copy of the policy's declarations page. The declarations page, as the certificate of insurance, showed the builder's risk coverage to be $968,150.00. McMurry Construction does not contest the fact that nobody in its offices read the certificate, the declarations page, or the policy upon their receipt.

This case was engendered when the livestock pavilion collapsed as it neared completion on June 11, 2005, due to improper bracing by a subcontractor. The cost to return the building to its condition before it collapsed was $951,715.00.

*W.N. McMurry Constr. Co. v. Cmty. First Ins., Inc.*, 2007 WY 96, ¶¶ 3–6, 160 P.3d 71, 73–74 (Wyo.2007) (*McMurry Construction I*) (footnotes omitted). Unfortunately, the policy limit for the livestock pavilion, being only $603,003.00, was low enough to invoke the policy's underinsured coinsurance penalty. Ohio Casualty calculated the total policy benefit to be $176,543.19. *Id.*, ¶ 7, 160 P.3d at 74.

[¶ 12] In *McMurry Construction I*, this Court upheld the district court's grant of summary judgment to BW Insurance and Ohio Casualty on tort and contract causes of action contained in McMurry Construction's complaint because those causes of action were barred by McMurry Construction's failure to read the insurance policy documents. *Id.*, ¶ 37, 160 P.3d at 83. We also, however, held that McMurry Construction's failure to read the policy documents did not preclude an action for equitable reformation of the insurance policy and remanded the case for consistent proceedings. *Id.*

[¶ 13] Upon remand, following a bench trial, the district court made the following findings of fact:

1. That the Plaintiff, W.N. McMurry Construction Company (McMurry) is a Wyoming corporation with its principal office in Casper, Wyoming. McMurry Construction was formed and incorporated in late 2002. W.N. McMurry and Rich Fairservis are the primary shareholders of McMurry Construction. Mr. Fairservis runs the business. Richard Nelson has been employed at McMurry Construction since June of 2003.

2. That the Defendant, Ohio Casualty Insurance Company (Ohio) is an Ohio corporation doing business in Wyoming. Ohio is an insurer which has its home office in Ohio, but which is authorized to sell insurance policies in many states, including Wyoming. Ohio has an agency agreement with BW Insurance Agency. Ohio has a regional underwriting office in Denver, Colorado. Mike McKenna was, and is, the Regional Underwriting Manager for Ohio in its Denver, Colorado, office. Kim Rons is one of eight senior underwriters in the Denver, Colorado, office. Since 2002, Ms. Rons has reported to and been supervised by Mr. McKenna.

3. B.W. Insurance Agency, Inc., (BW) is a successor of Community First Insurance, Inc., and is an insurance agency with an office in Casper, Wyoming. Richard Garrod has managed the Casper BW office since 2002. Leo Ashba and Judy Goodwin were sales agents with BW and its predecessor companies. Mr. Ashba retired from BW in July 2005 and Ms. Goodwin is still employed at BW. Ms. Goodwin began her career with BW's predecessor company in 1988, and she has always worked the commercial insurance side of the business. Mr. Ashba began working for BW's predecessor company in 1983, and while he sometimes sold his insured clients their various commercial insurance policies, he primarily worked the bond side of the business. Mr. Ashba was assisted for over 20 years by Debbie Stoddard.

4. Community First was purchased by Bank of the West in 2004. It has operated as BW ever since.

5. As an agent, BW would shop from among multiple insurance companies to seek and procure the best insurance coverage for its insured clients, such as McMurry, for the lowest premium.

6. Some of the insurers BW used for general liability, property, and business auto policies and coverage from 2002 through 2005 are AIG, SAFECO, The Hartford, Ohio, Colorado Casualty, and St. Paul–Traveler's.

7. BW sought builder's risk quotes from AIG, SAFECO, The Hartford, Colorado Casualty, Zurich North America, and Ohio.

8. BW is paid a commission by insurers when it places its insured clients' coverages with those insurers. Typically, no additional payment or consideration is received from the insured client.

9. Community First Insurance signed an agency agreement with Ohio on September 1, 2003, which was adopted by BW.

10. BW had Ohio's authority and permission to bind or commit Ohio to providing builder's risk coverage of up to $1,000,000 without Ohio's underwriters' knowledge or approval.

\* \* \* \*

34. Upon learning that McMurry intended to bid on the Fairground Project, in accordance with the usual service it provided, BW independently obtained from the bid center in Casper, Wyoming, where contract documents were on file, the documents from which BW could determine the insurance and bond requirements for bidders on the project and for successful bidder.

35. From the contract documents it obtained, BW recorded the bond and insurance requirements on a work paper referred to as the "Pink Sheet." Those requirements included a bid bond and a payment and performance bond in the amount of 100% of the contract amount, owner's protective liability insurance (OCP), and builder risk insurance in the amount of 100% of the contract sum.

36. Debbie Stoddard was Leo Ashba's long-time bond assistant. She was a bond specialist. Infrequently, Ms. Stoddard would be involved with clients' commercial insurance products or policies. Judy Goodwin worked primarily with clients'

commercial insurance policies and needs and rarely with bonds.

37. Debbie Stoddard knew McMurry would be submitting its bid on the Fairground Project to the State of Wyoming on or about January 6, 2005. Ms. Stoddard knew that McMurry Construction needed to purchase OCP and builder's risk coverage and that McMurry needed estimated premiums for the proposed insurance policies to add into its bid.

38. Debbie Stoddard asked BW's Judy Goodwin to obtain and provide Ms. Stoddard with quotes or estimates for the OCP and builders risk policies. Judy Goodwin then provided Ms. Stoddard with a $3,330 quote for OCP coverage and an estimate of $.187/per hundred for the builder's risk coverage.

39. Judy Goodwin obtained her $3,330 OCP estimated premium number from Ohio through rates provided by Ohio, but she likely obtained her $.187/per hundred builder's risk rate from Zurich.

40. Upon being notified that the project would be awarded to McMurry, BW proceeded to obtain a payment and performance bond, OCP insurance, and builder's risk insurance in accordance with the requirement of the contract documents it had obtained from the bid center.

41. BW employee Debbie Stoddard signed the payment and performance bond on behalf of the surety, Hartford Casualty Insurance Company, on February 24, 2005.

42. BW employee Judy Goodwin prepared an application to Ohio for the OCP and builder's risk policy for a contract of $5,524,000. This application was faxed to Ohio on or about February 1, 2005.

43. That at all times relevant, there was in place an agency agreement between Ohio and BW. Material provisions of the agreement include:

(a) "Agent is authorized under this agreement to write for the following divisions: personal lines, commercial lines, specialty lines."

(b) "The agent is authorized by the company to solicit and accept proposals for insurance covering such classes of risk as the company are licensed to write and which the company has authorized the agent to write subject to any restrictions imposed by law or by this agreement on the agent."

(c) "The company shall have the authority to expand or restrict the agent's authority effect upon written notice to the agent."

44. Ohio's authority was not limited in the agreement or by any subsequent writing delivered to the agent.

45. On or about February 22, 2005, Kim Rons, on behalf of Ohio, for the first time examined the application for builder's risk and OCP insurance. She wanted to know the value of each of the two buildings so separate coverage limits could be stated for each. She called Judy Goodwin of BW and requested that information.

46. Judy Goodwin asked Debbie Stoddard to call McMurry for the information. Stoddard then spoke to Jeremiah Robert, an estimator at McMurry, and asked for a "break-down of building costs."

47. Whatever words were used, McMurry understood the request to be for the costs of the steel for the two buildings. Stoddard reported to Goodwin, who reported to Rons, that the break-down of building costs for Livestock Pavilion were $603,003 and $365,147 for the Multi–Purpose building. Those numbers represent the cost of the steel packages for the respective buildings.

48. The February 1, 2005, application, through Ohio, requested a blanket builder's risk coverage for approximately $5.5 million.

49. That as a result of miscommunications in the phone calls between Rons, Goodwin, Stoddard, and Robert, Rons wrote the policy limits for the two buildings as $603,003 for the Livestock Pavilion and $365,247 for the Multi–Purpose Show Center. That the above figures represented only the costs of steel in the respective buildings and not the replacement costs for such buildings. As such, both buildings were grossly underinsured.

50. That Ohio relied upon BW to do most of the underwriting work for the risk on the buildings.

51. That the builder's risk policy written by Ohio was based upon a $.378/hundred on policy limits of $603,003 for the Livestock Pavilion and $365,247 on the Multi–Purpose Show Center. Ohio charged a total builder's risk premium of $3,659. The premium for a builder's risk policy of $5.5 million would have been $20,790.

[No. 52 was omitted in district court's decision.]

53. That the Livestock Pavilion building collapsed on June 11, 2005. Improper bracing by the sub-contractor, Montana Steel, was believed to be the reason for the collapse. That BW sent an insured copy of the Ohio policy to McMurry on March 7, 2005. BW sent the declaration page of the builder's risk policy to McMurry Construction on March 18, 2005. The Certificate of Insurance showed a builder's risk policy limit of $908,150 for the policy period of February 7, 2005, through February 7, 2006.

54. That the builder's risk insurance requested by McMurry was a type of insurance provided by Ohio. No one from Ohio testified that they would not have issued the policy for the two buildings. The Ohio representative testified that a combined total limit of $5.5 million would have resulted in additional inquires about the risk. However, they did not testify that those inquires would have resulted in rejecting the risk. The Court finds that if there had not been miscommunications, Ohio would have written a policy fully insuring both the livestock and multipurpose buildings.

The district court then made the following conclusions of law:

10. With respect to the builder's risk policy, the Court concludes that it was the intent of all parties (Ohio, BW, and McMurry) that the buildings in question would be insured for full value. That when the insurance contract was formed, it was the belief of all the parties that the buildings were fully insured.

11. That the livestock building and multipurpose building were not insured to full value due to a series of miscommunications and misunderstandings between Stoddard, Goodwin, Rons, and Robert. It should have been readily apparent to BW, Ohio and McMurry that coverages of $365,000 and $603,000 for the buildings in question were insufficient to insure the buildings.

12. That based on the application for builder's risk insurance, all parties knew that the two buildings, comprising 80,000 square feet and 50,000 square feet, were to be insured. Construction costs of $603,000 and $365,000 for the two buildings based on 130,000 square feet were clearly incorrect.

13. That it is clear from the exhibits that construction costs of $5.5 million were correct.

14. That once a claim was made after the loss for approximately $1 million, Ohio only agreed to pay $175,000 since the building was underinsured. Thus, Ohio penalized McMurry for underinsuring the building, clearly demonstrating that Ohio expected that the building would be fully insured.

15. That the June 27, 2005, letter from BW to Ohio, designated Plaintiff's Exhibit 22 in the builder's risk case, clearly indicates that a mistake had been made in that a $5.5 million insurable interest was proper.

16. That BW was acting on behalf of Ohio when the miscommunication and mistakes occurred. BW was in fact performing underwriting functions at the request of Ohio when BW and Ohio sought to have the building costs divided between the two construction projects. BW clearly knew and agreed that the buildings needed to be insured for full value and that the livestock building needed some $3.25 million in coverage.

17. That Ohio specifically directed BW to determine the separate values of the buildings. McMurry responded with steel costs, which Ohio and BW should have known were incorrect. That the miscommunications were primarily the fault of BW, who was working in an underwriting capacity for Ohio at that moment. It was Ohio who called BW in the action and was controlling BW's function at that time.

18. That it was the intent of all parties that the buildings be fully insured and that only through a mutual mistake and mis-

communication of all parties, did the buildings become underinsured. Thus, there was an antecedent agreement that the buildings be insured for full value.

Based on these findings and conclusions, the district court ordered reformation of the builder's risk policy.

## DISCUSSION

### *Standard of Review*

[¶ 14] We quote the district court's factual findings at length because the findings, coming after a bench trial, are reviewed with deference by this Court. The district court's factual findings are presumptively correct. The district court's findings of fact will only be overturned if, upon review of the entire evidence, we determine such findings to be clearly erroneous. The district court's conclusions of law are, as always, reviewed by this Court de novo. *Aviat Aircraft, Inc. v. Saurenman,* 2009 WY 98, ¶ 16, 213 P.3d 956, 964 (Wyo.2009); *Addison v. Dallarosa-Handrich,* 2007 WY 110, ¶ 8, 161 P.3d 1089, 1091 (Wyo.2007); *Mullinnix LLC v. HKB Royalty Trust,* 2006 WY 14, ¶ 12, 126 P.3d 909, 916 (Wyo.2006).

### *Law of Reformation*

[¶ 15] An insurance policy is a contract and as such is subject to the same rules of construction as any contract. *State ex rel. Arnold v. Ommen,* 2009 WY 24, ¶ 37, 201 P.3d 1127, 1137 (Wyo.2009); *Colorado Cas. Ins. Co. v. Sammons,* 2007 WY 75, ¶ 12, 157 P.3d 460, 465 (Wyo.2007); *Cathcart v. State Farm Mut. Auto. Ins. Co.,* 2005 WY 154, ¶ 18, 123 P.3d 579, 587 (Wyo.2005). Reformation is an equitable remedy available in cases where a mistake in the drafting of the written contract makes the writing convey the intent or meaning of neither party to the contract. This Court has previously explained:

Reformation is an equitable remedy which emanates from the maxim that "equity treats that as done which ought to have been done." 66 Am.Jur.2d *Reformation of Instruments* § 2 at 528 (1973). At its most fundamental level, the remedy acknowledges the fact that for one reason or another written instruments do not al-

ways accurately memorialize the antecedent agreement of the parties. *See* 3 Arthur L. Corbin, *Corbin on Contracts* § 540 (1960). Accordingly, a court acting in equity may reform a written instrument upon clear and convincing evidence of the following elements: (1) a meeting of the minds— a mutual understanding between the parties—prior to the time a writing is entered into, (2) a written contract, or agreement, or deed (3) which does not conform to the understanding, by reason of mutual mistake. Clear and convincing evidence is defined as "that kind of proof which would persuade a trier of fact that the truth of the contention is highly probable."

*Hutchins v. Payless Auto Sales, Inc.,* 2002 WY 8, ¶ 19, 38 P.3d 1057, 1063 (Wyo.2002), (some citations omitted).

[¶ 16] In *McMurry Construction I,* we stated:

The availability of the remedy of reformation is entirely dependent upon two particulars: (1) that the mistake occurred in the drafting of the instrument, rather than in reaching the antecedent agreement, *Hutchings v. Krachun,* 2002 WY 98, ¶ 20, 49 P.3d 176, 183 (Wyo.2002), *overruled in part on other grounds by White v. Allen,* 2003 WY 39, 65 P.3d 395 (Wyo.2003); and (2) that the mistake was "reciprocal and common to both parties with each party being under the same misconception as to the terms of the written instrument," *Mathis v. Wendling,* 962 P.2d 160, 164 (Wyo.1998). In other words, an agreement was reached, but that agreement was not correctly recited in the subsequently written instrument. Whether or not that initial agreement was reached is a question of fact. *Raymond v. Steen,* 882 P.2d 852, 856 (Wyo.1994).

*McMurry Construction I,* ¶ 19, 160 P.3d at 77–78 (footnote omitted).

### *Analysis*

[¶ 17] McMurry Construction is seeking, through reformation, to enforce a contract other than that into which it entered. In order to do so it must prove, by clear and convincing evidence, it mutually

agreed with Ohio Casualty that Ohio Casualty would provide $5.5 million in builder's risk coverage.

[¶ 18] The facts are relatively clear. BW Insurance submitted an application to Ohio Casualty for a builder's risk policy containing $5.5 million in blanket coverage. Ohio Casualty responded that they did not offer blanket coverage, effectively rejecting the application. There certainly was no meeting of the minds at this point.

[¶ 19] The process continued with Ohio Casualty requesting a breakdown of the replacement cost of each building so it could determine the individual coverage limits being sought. As stated in the facts, the numbers ultimately reported to Ohio Casualty, supplied by McMurry Construction, were $603,003 for the livestock pavilion and $365,247 on the multi-purpose show center. Ohio Casualty accepted the risk for the amounts reported for the respective buildings, calculated the premium therefore, and wrote the policy accordingly.

[¶ 20] We fail to see any mutual mistake engendered by the above facts. The required mutuality of a mistake can only be found if the parties had identical intentions as to the material terms of the policy. The essential terms of a contract for insurance include: the subject matter of insurance; risk insured against; duration of the risk; amount of insurance; and premium rate. 1A Lee R. Russ & Thomas F. Segalla, *Couch on Insurance*, § 17:1, at 2–3 (3d ed.2005) (footnotes omitted). "[T]he maximum amount for which the insurer may become liable in case of loss or destruction of the subject matter of the insurance is essential to the validity of the contract." *Id.* at § 17:8, at 14–15. In this case, the maximum amount of liability was never mutually agreed upon. Certainly McMurry Construction expected a business risk insurance policy providing $5.5 million of coverage. This expectation, however, amounts to a unilateral mistake on its part. Ohio Casualty held no such belief. Ohio Casualty wrote exactly the policy it intended to write—separate limits for each building, totaling slightly less than $1 million. There was no mistake on the part of Ohio Casualty as to the policy limits it was issuing. There

was no mistake on the part of Ohio Casualty as to the premium price being charged for the policy as issued. There was no juxtaposition of numbers or other scrivener's error in the policy. The written policy said exactly what Ohio Casualty intended it to say. There was no mistake "reciprocal and common to both parties with each party being under the same misconception as to the terms of the written instrument."

[¶ 21] The district court based its decision ordering reformation on its finding that there existed an antecedent agreement between the parties to the effect that the buildings be insured to full value, and since everyone involved should have known that the full value of both buildings equaled $5.5 million, the failure of the policy to reflect that amount was a mutual mistake, correctable through reformation of the policy.

[¶ 22] In this reasoning, the district court takes the law of reformation too far. Reformation is not available "[i]f the parties made a mistake about the premises of their agreement, about some fact in the world outside their word-processing machines." Black's Law Dictionary 1394 (9th ed.2009) (quoting Douglas Laycock, *Modern American Remedies* 39 (3d ed.2002)). One example of such a word-processing mistake is when an insured and the insurer agree that a certain property is to be covered, but the address of the property is written incorrectly in the insurance policy. Since both parties are agreed as to the property to be insured, the insurance policy can be reformed to correct the mistaken address. The mistake at issue, however, is not a mistake caused by mistyping numbers already agreed to. Instead, it is a mistake in reaching the antecedent agreement. This type of mistake cannot be corrected by means of reformation.

[¶ 23] Ohio Casualty takes issue with the district court's determination that BW Insurance was acting as Ohio Casualty's agent in procuring the business risk policy. Although we question this decision, we need not delve into the issue because, under the specific facts of this case, it makes no difference to the outcome. The consequence of finding that BW Insurance was acting as the agent for Ohio Casualty is to impute the knowledge

of BW Insurance to Ohio Casualty. *Cargill, Inc. v. Mtn. Cement Co.*, 891 P.2d 57, 62–63 (Wyo.1995). BW Insurance cannot be said to have known that McMurry Construction needed $5.5 million in business risk coverage. Certainly, BW Insurance knew the total contract price was $5.5 million, but a business risk policy does not necessarily cover the full contract price. Rather, business risk insurance covers the value of buildings under construction. The BW Insurance agent involved in the transaction testified that she did not question the numbers supplied by McMurry Construction as to the cost of the buildings because she assumed the difference between the contract price and the building costs was made up by other construction work (for example, earth moving). She fully intended the policy to cover only the amounts reported to her by McMurrry Construction. Whether or not she should have known better, while potentially important in other legal settings, is not pertinent to determining if a mutual mistake occurred in reducing the terms of the policy to writing.

[¶ 24] Further, even if one were to accept that BW Insurance, and thereby Ohio Casualty, had actual knowledge that McMurry Construction needed $5.5 million in coverage, such knowledge on the part of Ohio Casualty still does not support reformation of the policy. The bottom line is that Ohio Casualty, for whatever reason, never agreed to provide $5.5 million dollars of coverage. McMurry Construction and Ohio Casualty never came to a complete meeting of the minds respecting this essential term of the insurance contract. There was never any antecedent agreement to mistype.

## CONCLUSION

[¶ 25] The remedy of reformation is not available for the purpose of making a new and different contract for the parties. Instead, it is confined to establishment of the actual agreement reached between the parties as to the material terms of the contract. McMurry Construction and Ohio Casualty never reached a mutual agreement on material terms of the insurance policy—specifically the coverage limits. The decision of the district court is reversed.

## *APPEAL NUMBER S–08–0164*

[¶ 26] In this appeal, McMurry Construction challenges the interest calculations of the district court in its award of damages after reformation of the builder's risk policy. Since we have reversed the district court order requiring reformation of the builder's risk policy, this appeal is moot, and therefore dismissed.

## *APPEAL NUMBER S–08–0165*

[¶ 27] This appeal is based on the district court's grant of summary judgment in favor of BW Insurance on contract and tort claims made against it by McMurry Construction, as well as the district court's denial of McMurry Construction's attempt to reform its business auto insurance policy to gain coverage for a driver Ohio Casualty had expressly excluded from the policy.

## ISSUES

[¶ 28] McMurry Construction presents the following issues:

With respect to Appellee BW Insurance, the issue presented for review is:

I. Whether the insured was given a reasonable opportunity to read the final version of the policy and was mislead by the agent's assurances that the policy would be amended to include specific coverage.

With respect to Appellee Ohio Casualty, the issue presented for review is:

II. Whether the district court erred in finding that the insurance agent was acting for the insured and not the insurance company so that the agent's knowledge and intent was not imputed to the insurance company.

In its reply brief, McMurry Construction addresses the issue of "[w]hether *Cordero Mining Company v. U.S. Fidelity & Guarantee Ins. Co.*, 67 P.3d 616, 2003 WY 48 (Wyo.2003) was wrongly decided."

## FACTS

[¶ 29] Along with the same basic factual findings in paragraphs 1–10, as listed in appeal number S–08–0163, the district court

made the following findings of fact specifically related to the business auto policy:

11. On October 28, 2003, title was issued to McMurry for a 2004 GMC Pickup. The last four dig[et]s of the VIN on the pickup are 1703. The pickup is referred to hereafter as 1703.

12. In change endorsement # 3, effective August 18, 2003, pickup 1703 was included as a covered auto on McMurry's business auto policy.

13. On September 18, 2003, Ohio checked the driving record of McMurry employee Richard Nelson. The report showed that Nelson had four speeding tickets between February 6, 2002 and April 2, 2003. At that time Ohio added to the policy an exclusion-of-named-persons. The exclusion provided in part that, "it is agreed that the company shall not be liable for loss, damage, and/or liability due to the operation of a covered auto by the following persons: Richard David Nelson." The endorsement was accepted and signed by Zam Mathisen, who was authorized by McMurry to accept and sign it.

14. While Nelson was excluded from coverage in the Ohio policy, McMurry obtained liability insurance coverage for Richard Nelson and pickup 1703, which Nelson was driving, from Progressive Insurance Company. The named insured of the Progressive policy was McMurry.

15. At the renewal of the business auto policy for the policy period January 1, 2004, to January 1, 2005, pickup 1703 was included as a covered vehicle. However, it was deleted effective January of 2004. The apparent reason for dropping pickup 1703 from the 2004 policy was that Nelson and the pickup were covered by Progressive.

16. Ohio issued its first renewed business auto policy to McMurry for the policy term of January 1, 2004 through January 1, 2005. That policy included an exclusion of named person endorsement for Richard David Nelson.

17. In preparation for renewal of the business auto policy of 2005, McMurry sent a note to Leo Ashba of BW which said, "I am sending you copies of info re: our current insurance needs. Rich would like to meet with you on Thursday or Friday to discuss costs. Is that possible? If you need anything else, call me. Nancy." Transmitted with the note was a page entitled, "W.N. McMurry Construction list of vehicles." The third vehicle listed was pickup 1703. The information indicated that it was insured by Progressive Insurance and driven by Rick Nelson.

18. M[r]. Ashba did not respond to the note, but on November 11th, one of Mr. Ashba's assistants in the office signed Leo Ashba's name to an application for renewal of the business auto policy to be submitted to Ohio. Pickup 1703 was not listed on the vehicle schedule on the application.

19. BW sent McMurry's application for renewal of the auto policy to Ohio in November 2004 for the January 1, 2005, through January 1, 2006, policy. As he had in previous applications, Richard Nelson was listed as a company driver on the application. This was required information even though Mr. Nelson had been excluded as a covered driver.

20. BW sent the same renewal application to multiple other insurers. BW did this in an effort to shop for the policies with the best possible coverage for the lowest premiums for McMurry.

21. Kim Rons processed the business auto application on November 17, 2004, and Ohio renewed this business auto policy. Ms. Rons issued this second renewal policy with another exclusion-of-named-driver endorsement for Richard Nelson.

22. BW office assistants prepared a proposal of insurance for McMurry on or about December 31, 2004. Leo Ashba took that proposal to McMurry in McMurry's office on Friday afternoon December 31, 2004. Richard Nelson was listed as one of four business auto drivers for McMurry Construction in that document.

23. Rich Fairservis testified that at the presentation of the insurance proposal by Ashba, Mr. Ashba stated that Richard Nelson was a covered driver under the business auto policy. Ashba denied making that statement.

24, The Court finds by clear and convincing evidence that while Mr. Ashba may not recall having done so, he did in fact advise Mr. Fairservis that Mr. Nelson was a covered driver under the business auto policy. This is based on the following:

A. That McMurry cancelled the Progressive Insurance Policy insuring Richard Nelson and pickup 1703.

B. That in 2004 while Nelson was excluded from the Ohio policy, the vehicle that he drove, pickup 1703, was not in the schedule of covered vehicles.

C. That in November 2004, McMurry reported to BW that Nelson drove pickup 1703.

D. That Ashba put in a cover letter with the 2005 policy a statement that provided, "Please note that there are changes pending in your policy as there were changes made prior to and following the issue of the renewal that are not included in this renewal policy. Ohio Casualty will send you an endorsement soon that states the changes that have been made."

E. A change request for policy was faxed to Ohio on December 31, 2004, requesting that pickup 1703 be added to the policy and that Richard Fairservis be added as a driver. These changes could only have been requested after the meeting between Ashba and Fairservis.

F. Pickup 1703 was added to the policy on February 1, 2005.

G. There was no reason to cancel the Progressive Insurance to include the vehicle assigned to Nelson in the schedule of covered vehicles in the Ohio policy unless the exclusion of Nelson was deleted.

H. Nelson testified that he was present during the Ashba–Fairservis meeting and heard Ashba inform Fairservis that Nelson would now be insured under the Ohio policy.

25. That BW sent McMurry an insured copy of the January 1, 2005, through the January 1, 2006, second renewal of business auto policy. This policy included an exclusion of named person endorsement for Richard Nelson. No one with McMurry ever read this second renewal business policy or the exclusion of Richard Nelson.

26. No one with McMurry ever submitted any oral or written request to Ohio that the exclusion endorsement for Richard Nelson be deleted.

27. That from and after October 2, 2003, Ohio never intended, offered, or agreed to provide business auto coverage for Richard Nelson.

28. That Richard Nelson was driving an uninsured water truck on September 7, 2005. The water truck was owned by Granit Peak Development, a company affiliated with McMurry. While driving the uninsured water truck, Mr. Nelson ran into a passenger car being driven by Richard Borron on East 2nd Street in Casper, Wyoming. Faye Borron was the front-seat passenger.

29. Richard Nelson received two traffic citations arising out of his September 7, 2005, accident with the Borron vehicle. One ticket was for no proof of insurance and the other was for following too close. Both tickets were paid by Mr. Nelson or McMurry.

30. Faye Borron came to Casper, Wyoming, attorney Tom Sedar to pursue her bodily injury claim against Richard Nelson and McMurry. Mr. Sedar submitted a settlement demand letter to McMurry.

31. On February 20, 2006, Ohio notified McMurry that there was no coverage in that Mr. Nelson was an excluded driver under the business auto policy.

32. That Mr. Sedar filed a complaint against Mr. Nelson and McMurry on December 7, 2006. Mr. Reeves is defending Mr. Nelson and McMurry in that lawsuit.

The district court then came to the following conclusions of law:

6. That with respect to the auto policy, the Court concludes that it was the intent of Ohio that Nelson not be insured.

7. That at the December 31, 2004, meeting, Fairservis asked Ashba whether Nelson was insured. At that meeting Ashba was being criticized and pressed for an opinion by Fairservis, who was the owner of one of Ashba's principal clients. Ashba incorrectly stated that Nelson was insured.

The policy clearly indicated that Nelson was not insured from and after 2003.

8. I conclude that at the meeting, Ashba was acting on behalf of McMurry and not Ohio. Ashba's opinion was being sought and called into action by McMurry. Clearly at that moment, Ashba was seeking to please one of his most profitable and important clients. Ashba was simply wrong and certainly was not representing the interests of Ohio at that moment.

9. That while this Court believes there is clear and convincing evidence that Ashba erroneously advised McMurry, it is the conclusion of this Court that he was doing so as an agent for McMurry rather than Ohio. Therefore, the Plaintiff's claim for reformation of the auto policy is dismissed and the Defendant should have judgment in that regard. Thus, there is no antecedent agreement between Ohio and McMurry regarding the auto policy.

## DISCUSSION

### Contract and Tort Claims against BW

■ [¶ 30] In the lower court proceedings, McMurry Construction filed a complaint against BW Insurance alleging several causes of action sounding in tort and contract. BW Insurance filed a motion for summary judgment based on McMurry Construction's failure to read the policy and failure to mitigate damages. The district court granted BW Insurance's motion. On appeal, McMurry Construction argues the grant of summary judgment was erroneous because, although it did not read the policy, it should be excused because it did not have an adequate opportunity to read the policy.

■ [¶ 31] Our review of the grant of summary judgment is de novo. We have the same materials before us as the district court and use the same criteria. Summary judgment is appropriate if there are no genuine issues of material fact, leaving the prevailing party entitled to judgment as a matter of law. *McMurry Construction I*, ¶ 12–13, 160 P.3d at 75–76.

[¶ 32] As an initial matter, BW Insurance argues that McMurry Construction did not raise this defense in front of the district court. BW Insurance is correct in that McMurry Construction certainly did not raise the issue below as a legal defense. It did, however, argue the general point. We find the argument was sufficiently presented below to allow for appellate review.

[¶ 33] Turning, then, to the issue raised, McMurry Construction recognizes this Court's consistent holding, as stated in *McMurry Construction I*, that failure to read an insurance policy will bar claims against an agent for breach of contract and negligence. It also admits that it never read the business auto policy. It argues, however, the duty to read a policy is mitigated if the insured does not have a reasonable opportunity to read the policy. Without ruling on the legal merits of this argument, we find that, under the facts of this case, the argument is specious. The policy was delivered to McMurry Construction in January 2005. The policy as issued contained the exclusion-of-named-person endorsement excluding Richard Nelson from coverage. The accident happened in September 2005, eight months later. There was ample opportunity to read the policy.

[¶ 34] McMurry Construction argues that the reason we should find it did not have a reasonable opportunity to read the policy was that it never received the complete policy. It supports this argument by referencing the cover letter sent by BW Insurance when it received its copy of the policy in January 2005, which stated in part:

> Please note that there are changes pending for you [sic] policy as there were changes made prior and following the issue of the renewal that are not included in this renewal policy. Ohio Casualty will send you an endorsement soon that states the changes that have been made.

The endorsement from Ohio Casualty stating policy changes was quick in coming. On February 1, 2005, a policy change endorsement was issued. The change to the policy was the addition of one more vehicle to the coverage. Significantly, included in the policy change endorsement was a list of other endorsements applicable to the policy in gen-

eral. The named-person-exclusion was among the endorsements listed.

[¶ 35] McMurry Construction suggests that, even after this February 1 endorsement, it did not have the final version of the policy. There are two problems with this argument. First, the cover letter specifically referred to one endorsement that would be arriving soon. The February endorsement fits this description. There was no longer any reason to believe the policy was not complete at that time. Second, reliance on potential changes to be made in the future turns the requirement of reading the policy on its head. An insured is required to read the policy at hand. It cannot abdicate this responsibility under the guise of waiting for anticipated changes. McMurry Construction may have expected a change, but there was, at the time the policy was issued and at the time of the first endorsement, no change to the exclusion of Richard Nelson from coverage.

[¶ 36] The cover letter on which McMurry Construction places so much importance also said "[p]lease check the policy and let us know if any coverage needs to be added or amended." McMurry Construction never bothered to take this step. Under the circumstances, we agree with the district court that summary judgment in favor of BW Insurance was appropriate.

### Reformation of the Business Auto Policy

[¶ 37] The district court denied McMurry Construction's claim seeking reformation of the business auto policy after a bench trial. As stated in appeal number S–08–0163 above, we review the district court's factual findings after a bench trial under a clearly erroneous standard and its legal conclusions de novo. *Aviat Aircraft,* ¶ 16, 213 P.3d at 964; *Addison,* ¶ 8, 161 P.3d at 1091; *Mullinnix LLC,* ¶ 12, 126 P.3d at 916.

[¶ 38] We begin with the district court's factual finding that Leo Ashba, of BW Insurance, informed McMurry Construction that Richard Nelson was covered under the business auto policy. On appeal, Ohio Casualty does not dispute this finding. The question before us, therefore, is whether Ashba, and thus BW Insurance, was acting as an agent

for Ohio Casualty when he made that statement, effectively binding it to provide coverage for Nelson. We agree with the district court that Ashba was not.

[¶ 39] When it comes to the law of agency, there are typically two forms of agency relationship—actual and apparent. As between an insurance company and an agent, the limit of the agent's authority to bind the insurance company is governed by the agent's actual authority. As between the insurance company and third persons, the limit of an agent's authority to bind the principal is governed by his apparent authority.

Actual authority may be express or implied. An agent has express actual authority to bind the principal when the principal, orally or in writing, specifically grants the agent the power to bind the principal. Implied actual authority is established by the course of dealings between the parties and the circumstances surrounding the case.

Apparent authority is created when the principal holds the agent out as possessing the authority to bind the principal or when the principal allows the agent to claim such authority. To bind the principal under a theory of apparent authority, a third party must establish personal knowledge of, and reliance on, the apparent authority of the agent. In *Herbert Const. Co. v. Continental Ins. Co.,* 931 F.2d 989, 993–94 (2nd Cir.1991), the Second Circuit Court of Appeals articulated that test:

> To recover on this theory [apparent authority] the third party must establish two facts: (1) the principal "was responsible for the appearance of authority in the agent to conduct the transaction in question," *Ford* [*v. Unity Hospital* ], 32 N.Y.2d [464,] at 473, 346 N.Y.S.2d 238] at 244, 299 N.E.2d [659] at 664 [ (1973) ] (citation omitted), and (2) the third party reasonably relied on the representations of the agent, *Hallock,* [*v. State,*] 64 N.Y.2d [224,] at 231, 485 N.Y.S.2d 510,] at 513, 474 N.E.2d [1178,] at 1181 [ (1984) ].

This statement essentially modernizes our holding in *Ulen* [*v. Knecttle,* 50 Wyo. 94,

103–04, 58 P.2d 446, 449 (1936) ]. Apparent authority in agency cases will be determined according to this two-prong test. *Cargill,* 891 P.2d at 62–63 (some citations omitted). An agent possessing either actual or apparent authority may bind the principal. *Ulen v. Knecttle,* 50 Wyo. 94, 103–04, 58 P.2d 446, 449 (1936). Whether an agency relationship exists and the scope of the agent's authority are questions of fact. *Id. See also Velasquez v. Chamberlain,* 2009 WY 80, ¶ 19, 209 P.3d 888, 893 (Wyo.2009); *Carroll v. Bergen,* 2002 WY 166, ¶ 11, 57 P.3d 1209, 1214 (Wyo.2002).

[¶ 40] McMurry Construction grounds it entire appellate argument in favor of finding that BW Insurance was acting as Ohio Casualty's agent on *Cordero Mining Co. v. United States Fid. & Guar. Ins. Co.,* 2003 WY 48, 67 P.3d 616 (Wyo.2003). In *Cordero,* Cordero Mining Company was to be listed as an additional named insured in a policy procured by a subcontractor doing business at one of its mines. As it turned out, Cordero Mining Company was not so listed. The evidence supported a finding that both the subcontractor and its insurance agent, The Barlow Agency, an independent agency, knew that Cordero Mining Company was to be listed as an additional named insured. The question, then, was whether the insurance company, USF & G, should be bound by the insurance agent's knowledge. In *Cordero,* we presented the following analysis:

> The authority of an insurance agent to make a contract of insurance binding upon the insurer is determined by the law of agency. 8 Eric Mills Holmes, Holmes' Appleman on Insurance 2d, Law of Insurance Agents § 52.1 at 391 (1998). The underlying agency principle is that the insurer will be bound by the acts of its agent undertaken within the scope of that agency. *Id.* at 392. The courts lean toward a broad rather than a strict construction of an insurance agent's powers, an agent's written authority is to be broadly and fairly construed, and a narrow meaning is not to be given to it unless the language employed clearly indicates that such was the intention of the parties. *Id.* at 394. An "insurance agent" so far as the insurer is concerned, is a person with actual (including express or implied) authority to represent the insurer in dealing with third parties in matters relating to insurance. *Id.* at 395. In preparing and executing a policy, an insurance agent acts as the agent of the insurer. *Id.* at 397. Even where the person's functions consist merely of soliciting insurance, receiving applications, forwarding them, receiving in return the policy and delivering it, and collecting the premium, that person is an agent in the ordinary sense of that term. *Id.*

On the basis of similar principles, this court held in *Wyatt v. State Farm Fire and Casualty Company,* 78 Wyo. 228, 322 P.2d 137 (1958), that the knowledge of an agent is imputed to the insurer even when such knowledge is not in fact communicated to the insurer. In *Wyatt,* the insurer denied coverage after the insured's garage was destroyed by fire, claiming the policy covered the garage only if used for domestic purposes and the insured was using it for commercial purposes. The court concluded the policy did not clearly exclude coverage for commercial purposes and imputed to the insurer the agent's knowledge at the time the policy was negotiated that the garage was being used commercially. Although *Wyatt* involved a claim for estoppel against the insurer, we find the general principle enunciated there applicable to the claim presented here.

The USF & G agency agreement executed with Barlow provided in relevant part:

> 1. [USF & G] hereby grants authority to [Barlow] in the designated territory, to solicit and submit applications for insurance . . .; to issue and deliver policies, . . . certificates, endorsements and binders which [USF & G] may, from time to time, authorize to be issued and delivered; to collect and receipt for premiums thereon; to cancel such policies . . . at the discretion of [Barlow] where cancellation is legally possible; and to retain out of premiums collected and paid over to [USF & G] commissions at the rates set forth in the Commission Schedules.

Giving this provision a broad, fair construction, we conclude Barlow's knowledge that Cordero was to be named as an intended additional insured on L & T's policy may be imputed to USF & G.

*Cordero,* ¶¶ 22–24, 67 P.3d at 624–25. McMurry Construction, alleging that BW Insurance's agency agreement with Ohio Casualty is substantially identical to that between USF & G and The Barlow Agency in *Cordero,* summarily concludes the outcome must be the same. We disagree.

[¶ 41] In essence, McMurry Construction is putting forward an argument that BW Insurance had actual authority to bind Ohio Casualty.[1] The problem is that McMurry Construction's argument is presented in a factual vacuum. Even assuming the general provisions of the agency agreement between BW Insurance and Ohio Casualty are similar to the general provisions quoted in the agency agreement between The Barlow Agency and USF & G in *Cordero,* this is only part of the story.

[¶ 42] Although BW Insurance and Ohio Casualty had a general agency agreement, the agreement was limited. Both the representative of Ohio Casualty and Ashba testified at trial that the decision on which drivers to insure belonged solely to Ohio Casualty. Further, Ohio Casualty made it very clear in the terms of the business auto policy that BW Insurance had no authority to alter the terms of the policy. There is a common policy provision stating:

> This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

The exclusion-of-named-person endorsement contained the following provision:

This endorsement is in effect and shall apply to all renewals of this policy. This endorsement can be canceled or deleted by written request of the Named Insured, with approval of the Company.

Ohio Casualty could not have made it more clear that BW Insurance did not have the authority to change policy provisions, expressly including the exclusion of Nelson from coverage. "A condition in a policy prescribing that the insurer shall not be bound unless the execution of the agent's power shall be evidenced by written endorsement on the policy, is of the essence of the agent's authority, and a consent or act of the agent not so endorsed has been deemed void." 8 Eric Mills Holmes, *Holmes' Appleman on Insurance* § 50.3 (2d ed.1998). Under the facts of this case, BW Insurance did not have actual authority from Ohio Casualty to remove the exclusion-of-named-person endorsement.

## CONCLUSION

[¶ 43] McMurry Construction had plenty of time to read the business auto policy. The grant of summary judgment to BW Insurance on contract and tort claims was appropriate. Further, although Ashba told Fairservis that Nelson was covered, Ashba did not have the actual authority to effect such a change. Ohio Casualty never agreed to cover Nelson and never removed the exclusion-of-named-person endorsement from the policy. There was no basis for the reformation of the policy. The district court's decision on both of these issues is affirmed.

---

1. McMurry Construction cannot rely on apparent authority because it never, in fact, believed BW Insurance was serving as the agent of Ohio Casualty. Rich Fairservis, who runs McMurry Construction, testified that he believed BW Insurance to be McMurry Construction's agent, representing its best interest in all matters. He understood that BW Insurance would represent its interests over and above any insurance company's interests.